```
1    VEM VIM YENOVKIAN (AKA VEM MILLER YENOVKIAN)
     341 NORTH MONTEBELLO BLVD
2    MONTEBELLO, CA 90640
     USA
3    310-497-0650
     vemmiller@protonmail.com
4    unseatinjustice@gmail.com
5
```

**FILED**

Jun 08 2021

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ s/ soniad _____ DEPUTY

```
6    VEM VIM YENOVKIAN (aka Vem       )   Case No.: No. [case number]  '21 CV 1071 JLS MSB
                                      )
7    Miller Yenovkian)                )   CONSPIRACY TO COMMIT IN-
                                      )   TERNATIONAL KIDNAP UNDER COLOR
8    Plaintiff                        )   OF LAW, WILLFUL BLINDNESS AND
                                      )   OBSTRUCTION OF JUSTICE, DEPRI-
9        vs.                          )   VATION OF RIGHTS, PURPOSEFUL
                                      )   AVOIDANCE OF EVIDENCE, PUR-
10   PHILIP DRURY MOOR                )   POSEFUL AVOIDANCE OF KNOWLEDGE
                                      )   OF EVIDENCE, DISCRIMINATION
11   And                                  AGAINST FATHER AND CHILDREN TO
                                          DEPRIVE RIGHTS UNDER COLOR OF
12   THE CROWN OF ENGLAND                 LAW, ACTING "WITHOUT JURISDIC-
                                          TION", ACTING AS A "PUBLIC
13   Defendants                           MINISTER" UNLAWFULLY IMPERSON-
                                          ATING A JUDGE, ETC. (MORE BE-
14                                        LOW)

15                                        TRIAL BY JURY DEMANDED
16   ────────────────────────────────
17   JURISDICTION
18
19   I invoke Common Law for this case.
20   The Jurisdiction is the USA, because I am a U.S. Citizen, I live
     in the USA, in California and Nevada, and the Children who a
21   party to this case, and whose rights were also violated, are
     born and raised in the USA, in Los Angeles, California.
22
23   THE CRIMES COMMITTED
24   This is a matter of conspiracy to commit international kidnap of
     two minor children under color of law, purposeful avoidance of
25   evidence, purposeful avoidance of knowledge of offense, obstruc-
     tion of justice, discrimination against father and children to
26   deprive rights under color of law, defamation, slander, libel,
27   conspiracy against rights, A Criminal conspiracy to interfere in
     a child and parent's rights under color of law being perpetrated
28   in violation of laws, malicious use of process, Submitting false
```

1 report for the conspiracy to interfere in child custody, Submit-
2 ting false report for conspiracy to interfere in an attempt to
   abduct minor children under color of law, child assault, Physi-
3 cal Child Abuse, Emotional Child Abuse, Educational child abuse,
   Child exploitation, Perjury, Forgery, False report before a mag-
4 istrate, Planting fake evidence, Medical Malpractice, Legal Mal-
   practice, Judicial Malpractice, Concealing assaults against a
5 child minor, Parental Alienation, interfering with a child's
   mental health, bringing the office of judge into disrepute,
6 Judges lying on record, judges falsifying court documents, pro-
7 viding false statements and false testimony, Treason, Malicious
   prosecution.
8

9 **BACKGROUND TO CASE**

10 This background of this case pertains to International kidnap-
   ping of minor children, wrongful removal of children, and re-
11 fusal to return the children, severe assaults of minor children
   in the form of physical, emotional, and psychological abuse by
12 the the mother Sonia Helen Gulian, the maternal Grandmother
13 Zvart Gulian, the maternal Grandfather Antony Shahe Gulian.

14 https://youtu.be/_Aq7MFAdB1A

15
   On October 15, 2016, my children were kidnapped by their Mother
16 Sonia Helen Gulian, while we were in Toronto, Canada for a short
   stay due to a Film and TV contract that I, Vem Miller Yenovkian,
17 was under at the time.

18
   The children, Child S and Child V, were internationally kid-
19 napped and taken to the UK. For the avoidance of doubt, both
   children are born and raised in Los Angeles, California, and we
20 were simply in Toronto, Canada because I was under a 2 year con-
21 tract at that time, after the expiration of which I was supposed
   to return to California with the children.
22

23 I immediately filed for a Hague Application upon the abduction
   of my children, and went to the police to report the kidnapping.
24
   Due to matters of vast perjury and mishandling of the case in
25 the UK, the Hague application was extended from its intended 6
26 weeks, to 22 months. I have multiple cases filed, and being
   filed, both in the U.S.A. and the U.K., to deal with the corrup-
27 tion and conspiracy that has occurred since the kidnapping of my
   children.
28

1  In the bundles that I will be presenting to the court as a part
2  of this case, I will include many of the cases that are ongoing
   in regards to this matter of corruption and contempt of the
3  Hague Application.

4  After a hard fought 22 months of the Hague Application within
   the U.K., I successfully won the return of the children back to
5  their last place of habitual residence, Canada.

6  In Canada, a Canadian Judge named Jasmine Akbarali, returned the
7  children back to the U.K. within 3 months in contempt of the
   Hague Application return order, and she did so without looking
8  at any new evidence, and while acting in highly unlawful ways. I
   have a lawsuit pending against Judge Akbarali, as well as the
9  Judge that followed her, Judge Freya Kristjanson. Those lawsuits
10 will also be included within the decks for this case against Mr.
   Philip Drury Moor in a future filing as early as July 1, 2021.
11
   The Canadian Court process for the custody of my children, where
12 I had no representation, nor presence within the courtroom, went
13 on without me as a one sided affair in June 2019. This is de-
   spite the fact that I asked for the Canadian courts to give me
14 more time to find my financial footing, as I was utterly drained
15 financially because of the Hague process which was dragged out
   from 6 weeks, to 22 months.
16
   Due to Covid 19, and my damaged financial condition, I was not
17 able to take further action until September 2020, when I applied
18 for contact with my children through the U.K Courts.

19 On January 13, 2021, Judge Philip Drury Moor of the UK set an
20 order for contact with my children. It is important to note that
   my ex-wife immediately breached this order by disregarding the
21 contact order and laying more conditions upon the contact order.

22 This was also an illegal order by Judge Philip Drury Moor, as
23 one of the conditions of said contact was that I don't make or
   publish any videos about my children. This is direct violation
24 of a litany of laws that are contained within this legal action.
   It is important to note that the only time I have ever published
25 any videos of the children has been to do so in an UNLISTED
26 fashion, with the video aimed at a select small audience of
   Lawyers, children's health and welfare experts, and US Govern-
27 ment officials. I point you to the following unlisted video,
28 which shows the tremendous amount of abuse my children, most es-
   pecially Child S, has suffered as a result of the kidnapping and

abuse by their mother and maternal grandmother. This is informa-
tion that the Canadian and U.K. Judges have tried to censor de-
spite a litany of laws in the U.S.A., U.K., and Canada, that al-
low me, in my full legal right, to publish such videos and seek
help for my legal cases, as well as for the safety and welfare
of these abused children.

I came to England on May 1, 2021 for the sole purpose of having
contact with my children.

On May 4, 2021, Judge Philip Drury Moor revoked the contact or-
der with my children because he discovered that I had made an
UNLISTED video and site pertaining to the International kidnap-
ping and abuse of my children.

I tried to explain to Judge Philip Drury Moor that I was fully
within my legal right to place and use such a video in order to
attain much needed legal and professional advice pertaining to
the well being of my children.

I also tried to explain that there is nothing illegal or wrong
about using such a tool to protect the children, and my legal
rights, and in fact, as a "commercial film processor", and a
"mandated reporter", I am immune to any legal action or punish-
ment for doing what is mandated by the law. These laws are ex-
plained in detail below.

Therefore, Judge Philip Drury Moor has no legal right to with-
hold contact from my children because I had done what is pro-
tected and mandated by the law.

Regardless, Judge Philip Drury Moor ignored all my statements
about the law, and revoked the contact order, and set a trial
for matters pertaining to contact with my children until the
next hearing in his court, which he set for July 23, 2021.

As the writing of this document on June 7, 2021, I have not seen
my children.

I have spent 10s of 1000s of dollars to be in the UK. I have
lost 10's of 1000s of dollars from my business by being in the
UK.

This case explains how Judge Philip Moor acted in a wholly un-
lawful manner by withholding contact of my children who are so

severely damaged due to actions by their maternal family, and this Judge pierced his judicial immunity by acting "without jurisdiction", amongst other actions that caused for the piercing of his judicial immunity.

This case is a lawsuit against Judge Philip Drury Moor, who acted not as a judge, but as a "minister", with no judicial immunity, and therefore is liable for the damages caused by his actions, where he in fact violated the law, guilty of entrapment and racketeering, and caused both financial and emotional damages to my mother and I, who are in the UK indefinitely as a result of Judge Philip Moor's actions.

This case explains the laws behind this matter, how Judge Philip Moor violated these law, how Judge Philip Moor pierced his own judicial immunity, and the damages and restitutions I am seeking as a result.

In addition, I am suing Judge Moor's employer, the Crown of England, for allowing such a travesty to happen within their courts, with a judge like Philip Moor acting was a "minister", and disregarding the laws he is sworn to protect.

In the following list of laws and their explanation, I include both U.S. Laws, and U.K. Laws, as to leave no shadow of a doubt that under both set of laws, and both jurisdictions, what Judge Philip Drury Moor did was illegal, and thus causing for his immediate dismissal and the restoring of my rights under the law.

## **Piercing a Judge's Immunity**

**Civil Rights Violations (Under U.S. Law)**
**Title 18, U.S.C., Section 241 Conspiracy Against Rights**
When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgment; he acts no longer as a judge,
but as a " minister" of his own prejudices. [386 U.S. 547, 568]

**In the United Kingdom, under the Common Law of England**
The United Kingdom, famously and almost uniquely, does not have a constitution that is contained in a written constitutional instrument. Its constitution is to be found in the statutes passed by Parliament and in the common law, the law developed over the centuries in the decisions of the courts.

1 The principle of parliamentary sovereignty is fundamental in English legal system, and this is reflected in statutory inter-
2 pretation.

3 In the United Kingdom, According to Lord Scarman, "In the field
4 of statute law Parliament makes and unmakes the law, the judge's duty is to interpret and apply the law, not to change it to meet
5 the judge's idea of what justice requires. Interpretation does, of course, imply in the interpreter a power of choice when dif-
6 fering constructions which in his judgment best meets the leg-
7 islative purpose of the enactment." [i] This statement makes it clear that judges should apply instead of rewrite statutes, but
8 there may be different ways of application.

9 While the laws in the U.S.A. precisely prevent judges from act-
10 ing as "ministers" under penalty of punishment under the law, in the United Kingdom, the conduct of a judge is determined upon
11 "the common law of England," and the law developed over cen-
12 turies of decisions by the courts", which is subject to Statuto-ry Interpretation under three "Rules of Statutory Interpreta-
13 tion."

14 1.**THE MISCHIEF RULE** - The mischief rule is contained in Heydon's
15    Case (1584) 3 Co Rep 7, where it was stated that for the true interpretation of all statutes four things are to be consid-
16    ered:
          -1st. What was the common law before the making of the Act.
17        -2nd. What was the mischief and defect for which the common
18         law did not provide.
          -3rd. What remedy Parliament resolved and appointed to cure
19         the disease.
          -4th. The true reason of the remedy; and then the function
20         of the judge is to make such construction as shall suppress
21         the mischief and advance the remedy.

22 -The mischief rule was the product of a time when statutes were
23    a minor source of law by comparison with the common law, when drafting was by no means as exact a process as it is today and
24    before the supremacy of Parliament was established. The mis-chief could often be discerned from the lengthy preamble nor-
25    mally included.
26 -The mischief rule was regarded by the Law Commission, which re-ported on statutory interpretation in 1969, as a "rather more
27    satisfactory approach" than the other two established rules.

28

1  - Regardless of these facts, the decision of Judge Philip Drury
2  Moor has no basis in this category of the "Mischief Rule", be-
   cause the law that he was enforcing simply does not exist.
3  - In U.S. law terms under Title 18, U.S.C., Section 241 Conspira-
   cy Against Rights, as I will explain below, Judge Philip Drury
4  Moor was not undertaking the role of a judge during his deci-
5  sion of May 4, 2021, but was rather acting as a "minister", and
   therefore he Mr. Philip Drury Moor for this matter, and not
6  Justice Moor.

7  **2. THE LITERAL RULE**
       - The eighteenth and nineteenth centuries saw a trend towards
8        a more literal approach. Courts took an increasingly strict
         view of the words of a statute: if the case before them was
9        not precisely covered they were not prepared to countenance
         any alteration of the statutory language. One of the lead-
10       ing statements of the literal rule was made by Tindal CJ in
11       the *Sussex Peerage Case* (1844) 11 Cl&Fin 85:
12           - "… the only rule for the construction of Acts of Par-
               liament is, that they should be construed according to
13             the intent of the Parliament which passed the Act. If
               the words of the statute are in themselves precise and
14             unambiguous, then no more can be necessary than to ex-
15             pound those words in their natural and ordinary sense.
               The words themselves alone do, in such case, best de-
16             clare the intention of the lawgiver."
         - An example of the literal rule is:
17       - *Whiteley v Chappell* (1868) LR 4 QB 147.
         - What did Lord Esher MR state in R v Judge of the City
18         of London Court [1892] 1 QB 273?
19     - The literal rule was favored by the Law Commission on a va-
20       riety of grounds:
           - * It encouraged precision in drafting.
21         - * Should any alternative approach be adopted, an alter-
               ation of the statutory language could be seen as a
22             usurpation by non-elected judges of the legislative
23             function of Parliament, and other statute users would
               have the difficult task of predicting how doubtful pro-
24             visions might be rewritten" by the judges.
25 On the other hand the literal rule was criticized by the Law
   Commission (1969) on the ground that:
26         - * Judges have tended excessively to emphasize the lit-
               eral meaning of statutory provisions without giving due
27             weight to their meaning in wider contexts.
28         - * To place undue emphasis on the literal meaning of the
               words is to assume an unattainable perfection in

1  draftsmanship.
   * It ignores the limitations of language.
2
3  - Under "The Literal Rule", the decision of Judge Philip Drury
   Moor is even further distanced from the rule of law, as there
4  are literally <u>no laws what so ever</u> that support the decision of
   Justice Moor of May 4, 2021.
5
6  **3. THE GOLDEN RULE**
   - Some judges have suggested that a court may depart from the or-
7  dinary meaning where that would lead to absurdity. In *Grey v
   Pearson* (1857) 6 HL Cas 61, Lord Wensleydale said:
8    - "… the grammatical and ordinary sense of the words is to be
     adhered to, unless that would lead to some absurdity, or
9    some repugnance or inconsistency with the rest of the in-
10   strument, in which case the grammatical and ordinary sense
     of the words may be modified, so as to avoid that absurdity
11   and inconsistency, but no farther."
     - This became known as "Lord Wensleydale's golden rule". It
12   only applies where the words are ambiguous. An interpreta-
13   tion that is not absurd is to be preferred to one that is.
     An example is:
14     - *R v Allen* (1872) LR 1 CCR 367.
       - The Law Commission (1969) noted that:
15       - * The rule provided no clear means to test the ex-
16       istence of the characteristics of absurdity, incon-
         sistency or inconvenience, or to measure their
17       quality or extent.
         * As it seemed that "absurdity" was in practice
18       judged by reference to whether a particular inter-
19       pretation was irreconcilable with the general poli-
         cy of the legislature "the golden rule turns out to
20       be a less explicit form of the mischief rule".
21
22 - Even taken in its most literal sense, "The Golden Rule" also
   does not apply here in terms of the decision of Judge Moor, as
23 there are literally no laws in place that support the decision
   of Judge Moor of May 4, 2021.
24
25 - What Judge Philip Drury Moor did on May 4, 2021, simply has no
   basis in law what so ever, and therefore, in U.S. law terms, he
26 was not a judge when undertaking this decision, but rather a
   "minister" unlawfully impersonating a judge, and therefore act-
27 ing in a wholly Illegal capacity.
   - While the UK laws are not as direct as as Title 18, U.S.C.,
28 section 241 Conspiracy Against rights, when you follow the path

1  of the Common Law of England, and Judicial Precedent in the
   courts of England, you arrive to the same conclusion, that
2  Judge Philip Drury Moor acted on May 4, 2021 in a wholly unlaw-
   ful manner, and therefore did not act as a judge, but rather as
3  a "minister" unlawfully impersonating a judge, and therefore
   acting in a wholly illegal capacity.
4

5  -What I have described above is one of the ways the judicial im-
   munity of a judge is pierced.
6  -I will explain the 2nd way Judge Philip Drury Moor pierced his
   judicial immunity.
7

8
   **A Judge Acting Without Jurisdiction**
9

10 -A second way a Judge can pierce their judicial immunity is by
   acting "Without Jurisdiction."
11 -Jurisdiction is defined as:
12      -1: the power, right, or authority to interpret and apply
         the law a matter that falls within the court's *jurisdiction*
13      -2a: the authority of a sovereign power to govern or legis-
         late
14      -b: the power or right to exercise authority :
15      -3: the limits or territory within which authority may be
         exercised
16 - Judicial immunity is a Common Law concept, derived from judi-
         cial decisions. The idea of protecting judges from civil
17       damages was derived from the basic tenet and served to so-
         lidify the independence of the judiciary. It became wide-
18       ly accepted in the English courts and in the courts of the
         United States.
19
20 - In regards to Judicial and Related immunities, the present law
         is that judges have total immunity from suit, so long as
21       they are purportedly acting in their judicial capacity.
22 - Furthermore, Judicial immunity applies even when the judge acts
         in excess of the judge's jurisdiction, but not if the
23       judge acts without jurisdiction at all.
24 - "[T]he scope of the judge's jurisdiction must be construed
         broadly where the issue is the immunity of the judge. A
25       judge will not be deprived of immunity because the action
         he took was in error, was done maliciously, or was in ex-
26       cess of his authority; rather, he will be subject to lia-
         bility only when he has acted in the 'clear absence of all
27       jurisdiction.'" Stump v. Sparkman, 435 U.S. 349, 356-57
28       (1978) (quoting Bradley v. Fisher, 13 Wall. 335, 351
         (1871).

- "[T]he relevant standard for judicial immunity is whether the judicial official acted in 'the complete absence of all jurisdiction.'" Bare v. Atwood, 204 N.C. App. 310, 315 (2010) (quoting Mireles v. Waco, 502 U.S. 9, 12 (1991).
- Therefore, when a judge acts "Without Jurisdiction at all", he has acted in a manner that pierces his own judicial immunity.

- Furthermore, the history of U.S.A and U.K jurisdiction provides us with the answers to this question of jurisdiction.
- In this case, Judge Philip Drury Moor acted as if this is 1775, and the British Empire is controlling what happens in the American Colonies.
- In 1776, the US Colonies rebelled against the British Crown, and overthrew their control of the American colonies.
- Following this "Independence war of 1776", the US Established its Constitution, the sole purpose of which was to address the tyranny of the British empire and to protect U.S. Citizens from such tyranny.
- Article 1 of the constitution was put in place to prevent unlawful seizures, and tyranny of the British Monarch, and Article 14 was put in place to address the rights of citizens and their civil rights.
- Article 1 states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."
- Section 1 of Article 14 of the U.S. Constitution states "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
- In 1776, The Crown and any idea of monarchy, control of American domain by the British was wholly rejected with these new set of laws.
- In this case, Judge Philip Drury Moor enforced non existent U.K. laws, as a U.K. judge, upon a jurisdiction that Britain has had no control over for close to 250 years, and tried to punish me upon the actions I had

preformed while I am a U.S. Citizen, on U.S. soil, and while I am protected by Articles 1 and 14 of the U.S. Constitution.

– There is no gray area in what Judge Philip Drury Moor did. He acted wholly, grossly and incompetently "without jurisdiction", and therefore his judicial immunity is sufficiently and entirely pierced, and his entire order of May 4, 2021 is UNLAWFUL, ILLEGAL, and therefore NULL AND VOID.

– But not only was his actions a gross violation of U.S. laws, and infringing upon the rights of a U.S. citizen, there simply is no compatibility for what he did within U.K laws.

– There are no laws in the UK that prohibit the posting of UNLISTED videos online pertaining to my children.

– And most certainly, there are no laws in the UK that prevent me posting videos online that are UNLISTED, with the only goal being to attain legal advice, "petition the government for a redress of grievances", or present me with "due process of law", or protect me from my "freedom of speech" on U.S. Soil, and "freedom of press" on U.S. soil, and to protect the "life, liberty or property" of my children and I.

– It is important to note that under Common Law, the children are my property, and therefore the law above is compatible with the concept of protecting "life, liberty or property."

– It is important to note that both my children, Child S and Child V, are born in the United States, and most particularly in California.

– In fact, in the U.K., under the Human Rights Act 1998, similar protections are given to U.K. citizens as those expressed in Article 1 of the US constitution.

– Under the heading "Freedom of expression", the Human Rights act of 1998 reads:

– Human Rights Act of 1998, section 1 – Everyone has the <u>right to freedom of expression</u>. This right shall include <u>freedom to hold opinions</u> and <u>to receive and impart information and ideas without interference by public authority and regardless of frontiers</u>.

– The word "frontier," as defined by the Oxford dictionary, has both physical and intellectual meaning.

– The Oxford dictionary defines frontier as:

– 1 a: a border between two countries

– 2 a: a region that forms the margin of settled or developed territory.

-2 b: the farthermost limits of knowledge or achievement in a particular subject.
- 3 c: a line of division between different or opposed things.
- 3 d: a new field for exploitative or developmental activity.

-Under these definitions of the Human Rights Act of 1998, my actions are wholly protected and therefore Judge Philip Moor is not only guilty of acting "Without Jurisdiction" and thus piecing his own Judicial Immunity by putting forth wholly unlawful orders, he is also guilty of violating the laws of the land that he has been sworn to protect, in this case, directly breaching the Human Rights Act of 1998.

-The projections against the Misuse of such freedom of expression under the Human Rights Act of 1998 section 2, simply do not apply to this case.

-Human Rights Act of 1998, section 2 - The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, <u>for the prevention of disorder or crime</u>, <u>for the protection of health or morals</u>, <u>for the protection of the reputation or rights of others</u>, <u>for preventing the disclosure of information received in confidence</u>, or <u>for maintaining the authority and impartiality of the judiciary</u>.

-"The Prevention of disorder or crime" - as the facts of this case clearly indicate, there was no "disorder or crime" on my part. There is no injured party as a result of my actions on U.S. Soil, and therefore, when there is no injured party, there is no crime.

-In fact, it can be legitimately argued that the crimes committed have been wholly the act of my ex wife, the kidnaper, in the case for contact with the children of May 4, 2021, which is a court date that only existed because of her multiple breaches of court orders by my ex wife, including the court order of January 13, 2021; this individual (my ex wife) who is guilty of International abduction, which is a form of felony child abuse; this individual (my ex wife) who lied on the court record countless times, committed countless acts of perjury; this individual (my ex wife) who has lead an international conspiracy to kidnap child mi-

nors under color of law; this individual (my ex wife) who has lead an international conspiracy to deprive child minors of their rights under color of law; this individual (my ex wife) who continues to withhold contact in an act of kidnaping and ransom; this individual (my ex wife) who has drugged, physically and emotionally abused her children, many of which acts were done in order to get away with the crimes of International kidnapping of child minors under color of law; this individual (my ex wife) who has forged court records and documents, in order to continue getting away with the crimes of international kidnap and parental alienation; this individual (my ex wife) who has caused her law firm Dawson Cornwell to lie on the record countless times in order to create a status quo attained through multiple crimes; just to touch upon a few of her criminal actions and criminal behaviors. The injured parties here, the victims of crimes, are the children, Child S, Child V, myself, the paternal parents, and the entire paternal family, friends and community.

- "For the protection of health or morals" - this clause clearly does no good for either Judge Philip Drury Moor, nor the defendant (my ex wife) from the May 4, 2021 court date, as she is clearly the criminal party with a litany of crimes under her belt, and none of the evidence shows that she has done this in the protection of health and morals, and in fact, the evidence from CAFCASS, Brent Social Services, and Brayden Social Services, upon the abduction of the children and beyond, clearly show that her actions have been a detriment to the health of the children, and her behavior has been nothing but immoral and criminal. The children's schooling was compromised, and my daughter who was age appropriate is now 2 to 3 years behind in her schooling because of these criminal actions. The child is experiencing constant anxieties and trauma as a result. The assaults to the child have caused her to stutter and losing her speech during times of great anxiety.

- "For the protection of the reputation or rights of others" also does not serve Judge Philip Drury Moor, nor the Defendant of May 4, 2021, as the evidence shows that she has spent the last 4.5 years slandering, defaming and causing libel toward my reputation by committing to a wholly unlawful court process in the country of

Canada, where after conducting a war of attrition against me for 22 months while I was attempting to have the children sent back to their last place of habitual residence, she put me in a situation where continuing the legal battle was no longer possible, and thus entered a courtroom with no competition, a wholly one sided matter, and continued to lay down the same false accusations that had already been discredited in the UK courts during the Hague application, only now causing such false accusations to be printed upon the court record, printed online, and mimicked in blogs online.

- In addition, the defendant from May 4, 2021 (my ex wife) has caused the publication of a case online that refers to our child, Child S, as "disabled". If the protection the reputation of rights of others was a concern for the defendant of May 4, 2021, than she would not allow the placing of such a document online, that falsely refers to our child as "Disabled", something that can be viewed by her friends, and the world at large. The child was mildly on the spectrum prior to her kidnapping. Her health and condition has worsened as a result of the kidnapping, but she is far from "Disabled", and this comment alone is highly slanderous to this child who has to grow up with such inflammatory and defamatory statements about her. She is the furthest thing from "disabled", and typifying her as such is a form of CHILD ABUSE, DEFAMATION, SLANDER and LIBEL.

- "For preventing the disclosure of information received in confidence" also does not apply here, as the video in question shows Child S making disclosures about abuse that she was suffering, with the intent being to disclose these issues and therefore cause for remedies of these issues.

- Finally "for maintaining the authority and impartiality of the judiciary" which in this case would be a laughable notion, as I have already sufficiently demonstrated that Judge Philip Moor was the polar opposite of "impartial", and he had no "authority" in the matter of publishing the video, which happened on U.S. Soil, under U.S. jurisdiction. He acted "Without Jurisdiction" on a land that he has no domain over, and therefore, he is no such "authority".

- In the United Kingdom, Under the Common Law of England, as early as 1613, English courts had recognized that Article 39

restricted the power of judges. <u>Early English decisions had found that judges lost immunity from suit for acts clearly beyond their jurisdiction.</u>' Only in a single area did the English common law grant a broad form of immunity to judges, Recognizing a need to protect judges from the displeasure of the Crown and its ministers, the Star Chamber in Floyd v. Barker' had held that a judge could not be prosecuted in another court for an alleged criminal conspiracy in the way he had handled a murder trial. In refusing to try the case, the judges of Star Chamber held simply that if the king wished to discipline a judge, the king must do so himself without resort to a criminal prosecution.'

- Therefore, even in accordance with the Common Law of England, Mr. Philip Drury Moor violated the laws of the land he was sworn to protect.

- Therefore, in accordance with the Common Law of England, Judge Philip Drury Moor worked in violation of U.S. Law, and acted without jurisdiction according to U.K. law.

- Furthermore, As the Crown Proceedings Act only affected the law in respect of acts carried on by or on behalf of the British government, the monarch remains personally immune from criminal and civil actions.

- However, civil proceedings can still be brought using the two original mechanisms outlined above – by petition of right or by suit against the Attorney General for a declaration.

- In English Law, a petition of right was a remedy available to subjects to recover property from the Crown.

- The Crown is the state in all its aspects within the jurisprudence of the Commonwealth realms and their subdivisions (such as Crown dependencies, overseas territories, provinces, or states).

- A corporation sole, the Crown is the legal embodiment of executive, legislative, and judicial governance in the monarchy of each country. These monarchies are united by the personal unison of their monarch, but they are independent states.

- According to the Common Law of England, I am the name and title holder of my children's name and estate, meaning that according to the Common Law of this Land, the children are my property, owned by me.

- Therefore Judge Philip Drury Moor's only cause of legal and lawful action was to hand the children directly back to me, which he failed to do, and instead added more distance by violating my rights of contact, and doing so in a wholly unlawful manner that has no basis in law.

- Therefore his decision is wholly illegal on multiple counts.
- Finally, as the title holder of my children's name and their estate, I hold the highest legal standing in these courts, Good Standing, while Judge Philip Drury Moor has <u>no stand-ing in these courts, and neither does the Defendant, her Attorneys, not the clerk, nobody in these courts of the United Kingdom</u>.
- Therefore, Under the Common Law of England, Judge Moor is an administrator, not a Judge, and he has ILLEGALLY detained my children within the Borders of this United Kingdom.
- Therefore, this entire court process is ILLEGAL, and according to these laws that I have stated above, Mr Moor has acted completely out of the bounds of Common Law in claiming do-main over my children, which neither he, nor the courts of the United Kingdom, nor the Crown, have such domain.
- The holding of my children, and preventing me from seeing them due to exercising my rights under the US Constitution, and under my rights under the Common Law of England, is the definition of Kidnapping and Ransom.
- Therefore, one of the main demands of this lawsuit is that the Crown, who has acted <u>completely illegally</u> in claiming ju-risdiction over my children, thereby return my children Child S and Child V, to me without further delay, as they are holding my children ILLEGALLY.

**A Judge not acting with "Independence" nor "the appearance of independence"**

- In regards to Judicial and Related immunities, the present law is that judges have total immunity from suit, so long as they are purportedly acting in their "judicial capacity."
- Under the "Courts and Tribunals Judiciary Handbook," which is published and in print on the following website <u>https://www.judiciary.uk/about-the-judiciary/the-judiciary-the-government-and-the-constitution/jud-acc-ind/independence/</u> Under the section titled "Independence", It states:
  - "It is vitally important in a democracy that individual judges and the judiciary as a whole are impartial and independent of all external pressures and of each oth-er so that those who appear before them and the wider public can have confidence that their cases will be decided fairly and in accordance with the law. <u>When carrying out their judicial function they must be free of any improper influence. Such influence could come from any number of sources. It could arise from im-</u>

1   proper pressure by the executive or the legislature, by individual litigants, particular pressure groups,
2   the media, self-interest or other judges, in particular more senior judges."
3 – Furthermore, under the heading of this same "Court and Tri-
4   bunals Judiciary handbook," under the subheading "Why is independence important?", it states:
5   –"It is vital that each judge is able to decide cases solely on the evidence presented in court by the parties and in
6   accordance with the law. Only relevant facts and law
7   should form the basis of a judge's decision. Only in this way can judges discharge their constitutional re-
8   sponsibility to provide fair and impartial justice; to do justice as Lord Brougham, a 19th Century Lord Chan-
9   cellor, put it 'between man and man' or as Lord Clarke,
10   former Master of the Rolls put it more recently in 2005, 'between citizen and citizen or between citizen and the
11   state'."
12 –Furthermore, under the "Courts and Tribunals Judiciary Hand-
13   book," Under the section titled "Independence and the ap-pearance of independence", it states:
14   –"As well as in fact being independent in this way, it is of vital importance that judges are seen to be both inde-
15   pendent and impartial. Justice must not only be done – it must be seen to be done. It was for this reason that
16   the House of Lords in the Pinochet case in 1999 held
17   that a decision it had given had to be set aside and the appeal before it heard again by a panel of differ-
18   ent Law Lords. It had come to light after the original decision that one of the Law Lords might have given an
19   appearance that he was not independent and impartial
20   because of a connection with a campaigning organization which was involved in the case. In those circumstances,
21   and even though there was no suggestion that the Law Lord was not in fact independent or impartial, the de-
22   cision could not stand. Justice demanded that the ap-
23   peal be heard again before a panel of Law Lords who had and gave the appearance to reasonable well-informed ob-
24   servers that they were independent and impartial."
25 –Therefore, it is not just "Independence" that must be observed by any sitting judge wanting to make a credible decision,
26   but the "Appearance of Independence", in that even the suspicion of a lack of independence is enough to disquali-
27   fy the decision of a Judge, and be grounds for retrial.
28 – Furthermore, under the heading of this same "Court and Tri-
   bunals Judiciary handbook," under the subheading "The ways

in which independence is protected and its limits", it states:

- "Whilst an independent and impartial judiciary is one of the cornerstones of a democracy, the practical ways in which this is given effect are often treated with suspicion. For example, judges are given immunity from prosecution for any acts they carry out in performance of their judicial function. They also benefit from immunity from being sued for defamation for the things they say about parties or witnesses in the course of hearing cases. These principles have led some people to suggest that Judges are somehow 'above the law'."

- The article continues: "However, it is not right to say that Judges are above the law. Judges are subject to the law in the same way as any other citizen. The Lord Chief Justice or Lord Chancellor may refer a judge to the Judicial Complaints Investigations Office in order to establish whether it would be appropriate to remove them from office in circumstances where they have been found to have committed a criminal offense."

- The article continues: "Judicial independence does, however, mean that judges must be free to exercise their judicial powers <u>without interference from litigants</u>, the State, the media or powerful <u>individuals or entities</u>, such as <u>large companies</u>. This is an important principle because judges often decide matters between the citizen and the state and between citizens and powerful entities. For example, it is clearly inappropriate for the judge in charge of a criminal trial against an individual citizen to be influenced by the state. <u>It would be unacceptable for the judge to come under pressure to admit or not admit certain evidence</u>, how to direct the jury, or to pass a particular sentence. Decisions must be made on the basis of the facts of the case and the law alone."

- The article continues "This requirement that judges be free from any improper influence also underpins the duty placed on them to declare personal interests in any case before it starts, <u>to ensure that there is neither any bias or partiality, or any appearance of such</u>."

- These assessments as to "The protection of judicial independence" has been the focus of international resolutions, the most prominent of which are:

-The "United Nations Basic Principles on the Independence of
    the Judiciary and the role of lawyers", which were en-
    dorsed by the UN General Assembly in 1985 and 1990.
-In 1998, a similar statement of principle ("the Latimer
    House Principles") was also agreed by representatives
    from over 20 Commonwealth countries at a conference
    held at Latimer House, Buckinghamshire, UK.

-As a key component to maintaining judicial credibility, the
  above "Courts and Tribunals Judiciary Handbook", "<u>it would be
  unacceptable for the judge to come under pressure to admit or
  not admit certain evidence.</u>"
    -In this regard, we have evidence that Judge Philip Drury
      Moor accepted a position statement by the Defendant and her
      firm Dawson Cornwell that was submitted on a Friday April
      30, 2021 at 3:30 pm, with Monday May 3, 2021 being a bank
      holiday, and the hearing scheduled for Tuesday, May 4, 2021
      at 2pm.
    -This is less than 5 business hours prior to the hearing on
      May 4, 2021, a half business day prior.
    -Prior to this, on April 29, 2021 at 1:56 PM, Dawson Corn-
      well, the defendant's law firm, had emailed me asking
      "Please could you confirm that the attached court bundle is
      agreed to be filed with the court?"
    -I wrote back to them, bewildered that they would be submit-
      ting their court bundle in such short notice, with 1.5
      business days before the coming court hearing. It is impor-
      tant to note that I had sent my evidence bundles 5 weeks,
      and 3 weeks in advance.
    -I wrote to Dawson Cornell in response to their email of
      April 29, 2021 at 1:56 PM "I'm not quite sure why you're
      asking me for permission on April 29 2021 to make submis-
      sions. I made mine way in advance to give you plenty of
      time. Im hesitant to answer this question, as i believe the
      issue of causing delays is an epidemic issue with this case
      and your firm, as you've already been berated by 4 High
      Court Judges and Lords on this matter of 'Wholly unaccept-
      able' and 'disproportionate' delays."
    -Following this email by Dawson Cornwell, they sent their
      bundle submissions to the court on Friday, April 30, 2021,
      at 3:36 PM, and this time, they included a position state-
      ment that was not sent to me on April 29, 2021.
    -One of the overarching concepts behind having a "Rules of
      procedure and practice" for both parties to equally follow,
      is in order to "<u>to ensure that there is neither any bias or
      partiality, or any appearance of such.</u>"

1       -Yet despite these "Rules of procedure and practice", which
allocate such timelines for the timely submission of mate-

2       rials, Judge Philip Drury Moor accepted these radically
late submissions by Dawson Cornwell.

3       -In the "Rules and Practice" under the UK Ministry of Jus-
tice, the following examples are given.

4       -(i) Notice of an application must be served at least 3 days

5       before the hearing.
         -An application is to be heard on Friday 20 October.

6          -The last date for service is Monday 16 October.
         -(ii) The court is to fix a date for a hearing.

7          -The hearing must be at least 28 days after the date of

8          notice.
         -If the court gives notice of the date of the hearing on

9          1 October, the earliest date for the hearing is 30 Oc-

10          tober.
         -(iii) Particulars of claim must be served within 14

11          days of service of the claim form.

12          -The claim form is served on 2 October.
         -The last day for service of the particulars of claim is

13          16 October.
         -(4) Where the specified period -

14          -(a) is 5 days or less; and

15          -(b) includes -
         -(i) a Saturday or Sunday; or

16          -(ii) a Bank Holiday, Christmas Day or Good Friday,
         -that day does not count.

17          -Example: Notice of an application must be served at

18          least 3 days before the hearing
         -An application is to be heard on Monday 20 October.

19          -The last date for service is Tuesday 14 October.

20          -(5) Subject to the provisions of Practice Direction 5C,
         when the period specified -

21             -(a) by these Rules or a practice direction; or

22             -(b) by any judgment or court order, for doing any
            act at the court office ends on a day on which the

23             office is closed, that act shall be in time if done
            on the next day on which the court office is open.

24     -These timelines, which are supposed to be equally respected by
both plaintiff and defendant parties, are put in place, as the

25     "Courts and Tribunals Judiciary Handbook" reflects, "to ensure

26     that there is neither any bias or partiality, or any appearance
of such", which is a requirement that is put in place to insure

27     that judges be free from any improper influence also underpins
the duty placed on them to declare personal interests in any

28     case before it starts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Mr. Philip Drury Moor clearly failed to act according to the rules of conduct of the court.
- As the evidence that I have shows, which is further elaborated in Evidence deck, while I had submitted my position statement <u>5 weeks in advance</u>, Judge Philip Drury Moor allowed the Defense to submit their position statement with only <u>5 business hours</u> remaining until the hearing.
- <u>5 weeks advance, vs 5 business hours in advance</u>, on pure optics alone, this sets the wholly bias standard of the court of Judge Philip Drury Moor.
- As the Courts and Tribunals Judiciary handbook" states <u>"it would be unacceptable for the judge to come under pressure to admit or not admit certain evidence."</u>
- The fact that Judge Philip Drury Moor allowed these submissions into the court record is sufficient to demonstrate that he took the "unacceptable" step to "come under pressure to admit certain evidence."
- In addition, the evidence of the transcripts from this date May 4, 2021 shows, that he used this late evidence that was submitted on April 30, 3:26 PM, in the form a position statement by the defendant, against me in his decision.
- In fact, court transcripts will show that this was the only determining factor in Judge Philip Drury Moor's decision of May 4, 2021, and furthermore, the transcripts of this court date will show that he had not read ANY of my 5 week old submissions, indicating that he simply did not do his job.
- In my court submissions of May 4, 2021, which were made 5 weeks in advance, there were multiple pieces of evidence, and demands from the court reflected within the court submissions.
- As the court transcripts will show, none of these pieces of evidence, and demands from the court are even mentioned by Judge Philip Drury Moor, as if they did not exist.
- As Judge Philip Drury Moor's absence from his job for the entirety of April 2021 indicates, he was on holiday for the 4 weeks proceeding this court date.
- This fact, and the court transcripts, would therefore indicate that he had not even taken the time to read my submissions, which were made 5 weeks in advance, while he took the time to read the defendant's position statement, and look at the defendant's bundle, even

though these submissions were made only 5 business
hours in advance of the hearing.

- Furthermore, the hearing on May 4, 2021 was scheduled for
  2 hours. Yet Mr. Philip Drury Moor concluded the hear-
  ing in under 1 hour.
- As the transcripts from this hearing will indicate, noth-
  ing about my case, my evidence, my demands from the
  court, was mentioned or discussed by Judge Moor.
- The Court of this date, reduced from 2 hours to 1 hour,
  was occupied with the topic of this UNLISTED video,
  and the subject matters around this topic of the UN-
  LISTED video, a topic that should not have even been
  brought up nor considered since it was made in breach
  of court deadlines in a way that demonstrated a high
  level of bias and preference by Judge Philip Drury
  Moor.
- The entirety of Judge Philip Drury Moor's decision was
  based upon punishing me for publishing an UNLISTED
  video on the internet. The claims that such a video
  were published were made for the first time on April
  30, 2021 at 3:26 PM via the position statement of the
  defendant, a document that should have never been ad-
  mitted into the court record, as its admission is evi-
  dence that Mr. Philip Drury Moor accepted evidence way
  beyond the "Rules of Practice" deadline, literally 5
  business hours prior to the hearing.
- Therefore, it is clear that Mr. Philip Drury Moor acted
  with <u>bias and partiality</u>, And did so by allowing <u>in-
  terference from litigants</u>.
- Like the example above, where "the House of Lords in the
  Pinochet case in 1999 held that a decision it had giv-
  en had to be set aside and the appeal before it heard
  again by a panel of different Law Lords because the
  original decision that one of the Law Lords might have
  given an appearance that he was not independent and
  impartial because of a connection with a campaigning
  organization which was involved in the case," any de-
  cision made by Judge Philip Drury Moor is therefore
  Null and Void, and therefore his decision of May 4,
  2021 cannot and should not stand.
- In that case of Pinochet, "Justice demanded that the ap-
  peal be heard again before a panel of Law Lords who
  had and gave the appearance to reasonable well-in-
  formed observers that they were independent and impar-
  tial",

1    -Therefore, I would demand that justice in this case can
2    not stand unless the decision of Judge Philip Moor of
     May 4, 2021 is tossed out, returning us to a place
3    where we were back in January 13, 2021, when the orig-
     inal contact order was made, with another court trial
4    set by a higher court in order to retry the case of
     May 4, 2021 in a longer more substantial manner that
5    can address all the issues at hand.

6  - Furthermore, Judge Philip Drury Moor allowed secretive submis-
7    sions into his court, and into the court record.
     - Namely, Dawson Cornwell, the law firm of the Defendant for
8      the hearing of May 4, 2021, submitted a draft of a U.S.
       based lawsuit that I had sent to them as a private com-
9      munication, a lawsuit that has nothing to do with the
       matters of contact with my children. Dawson Cornwell
10     made this submission in secret on May 3, 2021.
11   -The May 4, 2021 hearing was set because the Defendant re-
12     fused to follow the Contact order set forth on January
       13, 2021 by Judge Philip Drury Moor, and the Defendant
13     refused to allow contact with my children, despite the
       court order.
14   -The multiple breaches of this court order by the Defendant,
15     was the material reason for the hearing on May 4, 2021.
     -Yet as the transcripts indicate, Dawson Cornwell sent this
16     private matter and private case to Judge Philip Drury
17     Moor, which is:
       - Firstly, a violation of GDPR Privacy Laws, a violation
18       that Dawson Cornwell is guilty of simply by sending
         this private and unrelated matter to Mr. Philip Drury
19       Moor on May 3, 2021.
20     - Secondly, I was not notified about this secret submis-
         sion that is in breach of my privacy rights, until
21       the barrister from Dawson Cornwell revealed it during
         the hearing on May 4, 2021. This is clearly reflected
22       within the transcripts of this hearing on May 4,
23       2021.

24  -Therefore, there is absolutely no way to look at the hearing of
25    May 4, 2021, than to state that Mr. Philip Drury Moor, act-
      ed with bias and partiality, under improper influence, and
26    thus acted in a wholly unacceptable fashion that is unbe-
      coming of a Judge in this High Court of England, and he was
27    clearly under pressure to admit certain evidence, while
28    wholly disregarding nearly the entity of my evidence and

position statement, which was <u>properly submitted 5 weeks in advance of the hearing</u>.

**Mr. Philip Drury Moor Commits the crimes of Entrapment, Racketeering, Conspires to internationally kidnap children and deprive children and their father of their Civil and Human rights, under the color of law, while impersonating a Judge of the UK High Court, but acting as a "minister"**

- During the court hearing of May 4, 2021, Judge Philip Drury Moor, who had not taken the time to read my evidence, made the comment that Vem Miller Yenovkian "Cannot help himself" in regards to documenting and reporting evidence of child abuse and child destruction.
- Im truly confused as to what he means by "Cannot Help Himself". Is there such a thing as a disorder pertaining to people who cannot help but video and capture evidence of child abuse, child destruction, child endangerment?
- Is the idea of documenting evidence of criminality involving child abuse, child assaults some kind of "cannot help himself" drug type addition?
- Of course not. The fact that Mr. Philip Drury Moor makes such statements makes it clear that he is operating in a world of hyperbole, not legal doctrine.
- For the last 20 years, I have worked in the world of drug intervention. This culminated with a series that I created about teenage drug interventions being produced for television in the USA.
- As a "Commercial Film Processor" and a "Mandated Reporter", I am bound by the laws of the land where I live, which has legal jurisdiction over me, to document all acts of potential child abuse. Failing to do so is a "Misdemeanor A", and subject to punishment of up to 6 months in jail, and a fine.
- Every expert that I have known in the field of Child Psychology, Drug Intervention, and Child Therapy, has stated that it is absolutely essential to document any forms of abuse to a child, and this includes the laws of the land that has legal jurisdiction over me, namely the United States and California, and since the world that my children have inhabited for the last 4.5 years is one of International kidnapping, which is a form of criminal felony child abuse, this alone is enough to warrant the documenting of everything of concern since the children were kidnapped from their home on October 15, 2016.
- But the kidnapping is just one form of abuse.

- The children, as the evidence shows, especially Child S, were subjected to assault, were subjected to drugging, were subjected to humiliation, were subjected to molestation, were subjected to false diagnosis by their mother, who lied to the school about conditions the children never had, saying that Child S had PTSD, so the kidnapper could reach her goal of succeeding in the criminal act of International kidnapping, and unlawful removal of minors.
- The mother made the children sleep on deflating blow up beds in a basement for an entire summer in Canada upon their Hague Application mandated return, so she could achieve her criminal goal, executing the abusive act of sleep deprivation of children in order for the children to be as uncomfortable as possible for an entire summer during this return to Canada, so she could manipulate the children's minds and play with their emotion, so they could wish for their beds back in London, England, so she could successfully manipulate the entire legal process. This is despite the fact that there was a matrimonial home available for the children, where they had their beds available, where they could have slept comfortably, and healthy. Also, she was given money for undertakings in order to have a second option to rent a home ($18,690), and despite this, she used the money for other things, and made the children sleep on these deflating blow up beds in the basement of her aunts home for the entire summer. When the cousins arrives, they slept upstairs, and thus the children were humiliated and degraded, being made to feel like second class citizens.
- When a judge in one jurisdiction forces you to break the laws in another jurisdiction, thereby putting your freedom and safety in jeopardy, he has broken quite a number of laws, and those key laws are entrapment and racketeering.
- There are countless laws in place to protect one of such judicial and legal abuse.
  - Rule 5.5 - Unauthorized practice of law. Simply stated, this law prohibits any lawyer or judge from enforcing the laws and his/her decisions of one jurisdiction on to the other.
  - CIVIL RIGHTS VIOLATIONS Title 18, U.S.C., Section 241 Conspiracy Against Rights: This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the

laws of the United States, (or because of his/her having exercised the same).
- As of now, Judge Moor, a UK Judge, has aligned himself with Judge Madam Akbarali and Judge Freya Kristjanson, Canadian Judges, in conspiring to prevent "the free exercise or enjoyment of any right or privilege secured to him / her by the constitution or laws of the United States, (or because of his / her having excised the same)
- Title 18, U.S.C., Section 242 Deprivation of Rights Under Color of Law: This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S.
- When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgment; he acts no longer as a judge, but as a "minister" of his own prejudices. [386 U.S. 547, 568].
- A **judge is liable for injury caused by a ministerial act**; to have immunity the judge must be performing a judicial function. See, e. g., Ex parte Virginia, 100 U.S. 339 ; 2 Harper & James, The Law of Torts 1642-1643 (1956).
- The presence of malice and the intention to deprive a person of his civil rights is wholly incompatible with the judicial function.
- **Fraud Upon the Court is where the Judge (who is NOT the "Court")** does NOT support or uphold the Judicial Machinery of the Court. The Court is an unbiased, but methodical "creature" which is governed by the Rule of Law... that is, the Rules of Civil Procedure, the Rules of Criminal Procedure and the Rules of Evidence, all which is overseen by Constitutional law. The Court can ONLY be effective, fair and "just" if it is allowed to function as the laws proscribe. It is illegal, and EVERY case which has had fraud involved can be re-opened AT ANY TIME, because there is no statutes of limitations on fraud.
- "Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse herself sua sponte under the stated circumstances." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989).
- Further, the judge has a legal duty to disqualify himself even if there is no motion asking for his disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] im-

poses a duty on the judge to act sua sponte, even if no mo-
tion or affidavit is filed." Balistrieri, at 1202.

– Judges do not have discretion not to disqualify themselves.
By law, they are bound to follow the law. Should a judge
not disqualify himself as required by law, then the judge
has given another example of his "appearance of partiality"
which, possibly, further disqualifies the judge. Should an-
other judge not accept the disqualification of the judge,
then the second judge has evidenced an "appearance of par-
tiality" and has possibly disqualified himself/herself.
None of the orders issued by any judge who has been dis-
qualified by law would appear to be valid. It would appear
that they are void as a matter of law, and are of no legal
force or effect.

– Should a judge not disqualify himself, then the judge is
violation of the Due Process Clause of the U.S. Constitu-
tion. United States v. Sciuto, 521 F.2d 842, 845 (7th Cir.
1996) ("The right to a tribunal free from bias or prejudice
is based, not on section 144, but on the Due Process
Clause.").

– In this destruction of child S video, we see the presentation
of Child S degrading due to the kidnapping and abuse she has
suffered over the last 4.5 years, with continuous assaults to-
ward her in the form of physical, emotional, and psychological
abuse.

  – Destruction of Child S – https://youtu.be/ Aq7MFAdB1A

  – Therefore, in addition and combination to the laws de-
  scribed above, Judge Moor, just as Judge Akbarali (Canada)
  and Judge Kristjansan (Canada) before him, are attempting
  to force me to commit crimes under color of law.

THE LAWS THAT JUDGE MOOR, JUDGE AKBARALI, AND JUDGE KRISTJANSAN
ARE AND HAVE BEEN FOCING ME TO VIOLATE, DESPITE THE FACT THAT
THEY HAVE ACTED WITHOUT JURISDICTION AND THEREFORE ARE NO LONGER
JUDGES, BUT MINISTERS COMMITTING MULTIPLE CRIMES

**START OF LAWS SECTION**

**MANDATORY REPORTING AND DOCUMENTING OF CHILD ABUSE**

Section 419. Immunity from Liability. Any person, official or institu-
tion participating in good faith in the making of a report, the taking
of photographs, or the removal or keeping of a child pursuant to this
title shall have immunity from any liability, civil or of any person

required to report cases of child abuse or maltreatment shall be pre-sumed. Section 420. Penalties for Failure to Report. 1. <u>Any person, official, or institution required by this title to report a case of suspected child abuse or maltreatment who willfully fails to do so shall be guilty of a class A misdemeanor. 2. Any person, offi-cial, or institution required by this title to report a case of suspected child abuse or maltreatment who knowingly and willful-ly fails to do so shall be civilly liable for the damages proxi-mately caused by such failure.</u>

**REPORTING CHILD ABUSE**

The Federal Child Abuse Prevention and Treatment Act (CAPTA) re-quires each State to have provisions or procedures for requiring certain individuals to report known or suspected instances of child abuse and neglect. The results indicate that all States, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands iden-tify in statute the professionals and other persons who are re-quired to report instances of suspected child maltreatment. These statutes also address reporting by other persons, the re-sponsibilities of institutions in making reports, standards for making a report, and confidentiality of the reporter's identity.

Abstract Sections from Article 6, Title 6, Social Services Law Section 412. Definitions 1. Definition of Child Abuse (see N.Y.S. Family Court Act Section 1012(e)) An "abused child" is a child less than eighteen years of age whose parent or other per-son legally responsible for his care: 1) Inflicts or allows to be inflicted upon the child serious physical injury, or 2) Cre-ates or allows to be created a substantial risk of physical in-jury, or 3) Commits or allows to be committed against the child a sexual offense as defined in the penal law. 2. Definition of Child Maltreatment (see N.Y.S. Family Court Act, Section 1012(f)) A "maltreated child" is a child under eighteen years of age whose physical, mental or emotional condition has been im-paired or is in danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care: 1) in supplying the child with adequate food, clothing, shelter, education, med-ical or surgical care, though financially able to do so or of-fered financial or other reasonable means to do so; or 2) in providing the child with proper supervision or guardianship; or 3) by unreasonable inflicting, or allowing to be inflicted, harm or a substantial risk thereof, including the infliction of ex-

cessive corporal punishment; or 4) by using a drug or drugs; or 5) by using alcoholic beverages to the extent that he loses self-control of his actions; or 6) by any other acts of a similarly serious nature requiring the aid of the Family Court. Section 415. Reporting Procedure. Reports of suspected child abuse or maltreatment shall be made immediately by telephone* and in writing within 48 hours after such oral report…written reports shall be made to the appropriate local child protective services on this form (Report of Suspected Child Abuse and Maltreatment, LDSS-2221-A).

**CONSEQUENCES OF FAILING TO REPORT**

A person who fails to make a required report is guilty of a misdemeanor punishable by up to six months in jail and/or up to a $1,000 fine (California Penal Code Section 11166[c])

**How does mandatory reporting legislation define a child?**

Legislation requires mandatory reporting in relation to all young people up to the age of 18 years.

**MANDATORY REPORTING OF CHILD ABUSE**

Mandatory reporting laws exist in Australia, Brazil, Canada, Denmark, France, Hungary, the Republic of Ireland, Israel, Norway and the United States.

**THE DEFINITION OF CHILD ABUSE**

**34 U.S. Code § 20341 - Child abuse reporting**
(a) In general
**(1) Covered professionals**
A person who, while engaged in a professional capacity or activity described in subsection (b) on Federal land or in a federally operated (or contracted) facility, learns of facts that give reason to suspect that a child has suffered an incident of child abuse, shall as soon as possible make a report of the suspected abuse to the agency designated under subsection (d) and to the agency or agencies provided for in subsection (e), if applicable.

**(2) Covered individuals**
A covered individual who learns of facts that give reason to suspect that a child has suffered an incident of child

1   abuse, including sexual abuse, <u>shall as soon as possible make a</u>
    <u>report of the suspected abuse to the agency designated by the</u>
2   <u>Attorney General under subsection</u> **(d)**.

3

    **(b) Covered professionals**
4   Persons engaged in the following professions and activities are
5   subject to the requirements of subsection (a)(1):
    **(1)** Physicians, dentists, medical residents or interns, hospital
6   personnel and administrators, nurses, health care practitioners,
    chiropractors, osteopaths, pharmacists, optometrists, podia-
7   trists, emergency medical technicians, ambulance drivers, under-
8   takers, coroners, medical examiners, alcohol or drug treatment
    personnel, and persons performing a healing role or practicing
9   the healing arts.
    **(2)** Psychologists, psychiatrists, and mental health profession-
10  als.
11  **(3)** Social workers, licensed or unlicensed marriage, family, and
    individual counselors.
12  **(4)** Teachers, teacher's aides or assistants, school counselors
13  and guidance personnel, school officials, and school administra-
    tors.
14  **(5)** Child care workers and administrators.
    **(6)** Law enforcement personnel, probation officers, criminal pros-
15  ecutors, and juvenile rehabilitation or detention facility em-
16  ployees.
    **(7)** Foster parents.
17  **(8) Commercial film and photo processors.**
18  **(c) Definitions**
    For the purposes of this section—
19  **(1)** the term "child abuse" means the physical or mental
20  injury, sexual abuse or exploitation, or negligent treatment of
    a child;
21  **(2)** the term "physical injury" includes but is not limited to
    lacerations, fractured bones, burns, internal injuries, severe
22  bruising or serious bodily harm;
23  **(3)** the term "mental injury" means harm to a child's psychologi-
    cal or intellectual functioning which may be exhibited by severe
24  anxiety, depression, withdrawal or outward aggressive behavior,
25  or a combination of those behaviors, which may be demonstrated
    by a change in behavior, emotional response or cognition;
26  **(4)** the term "sexual abuse" includes the employment, use, persua-
    sion, inducement, enticement, or coercion of a child to engage
27  in, or assist another person to engage in, sexually explicit
28  conduct or the rape, molestation, prostitution, or other form of
    sexual exploitation of children, or incest with children;

**(5)** the term "sexually explicit conduct" means actual or simulat-
ed—
**(A)** sexual intercourse, including sexual contact in the manner of
genital-genital, oral-genital, anal-genital, or oral-anal con-
tact, whether between persons of the same or of opposite sex;
sexual contact means the intentional touching, either directly
or through clothing, of the genitalia, anus, groin, breast, in-
ner thigh, or buttocks of any person with an intent to abuse,
humiliate, harass, degrade, or arouse or gratify sexual desire
of any person;
**(B)** bestiality;
**(C)** masturbation;
**(D)** lascivious exhibition of the genitals or pubic area of a per-
son or animal; or
**(E)** sadistic or masochistic abuse;
**(6)** the term "exploitation" means child pornography or child
prostitution;
**(7)** the term "negligent treatment" means the failure to provide,
for reasons other than poverty, adequate food, clothing, shel-
ter, or medical care so as to seriously endanger the physical
health of the child;
**(8)** the term "child abuse" shall not include discipline adminis-
tered by a parent or legal guardian to his or her child provided
it is reasonable in manner and moderate in degree and otherwise
does not constitute cruelty;
**(9)** the term "covered individual" means an adult who—
**(A)** is authorized, by a <u>national governing body</u>, a member of
a <u>national governing body</u>, or an <u>amateur sports</u>
<u>organization</u> that participates in interstate or <u>international</u>
<u>amateur athletic competition</u>, to interact with a minor or <u>ama-</u>
<u>teur athlete</u> at an <u>amateur sports organization</u> facility or at
any <u>event</u> sanctioned by a <u>national governing body</u>, a member of
a <u>national governing body</u>, or such an <u>amateur sports organiza-</u>
<u>tion;</u> or
**(B)** is an employee or representative of the United States Center
for SafeSport;
**(10)** the term "event" includes travel, lodging, practice, compe-
tition, and health or medical treatment;
**(11)** the terms "<u>amateur athlete</u>", "<u>amateur athletic</u>
<u>competition</u>", "<u>amateur sports organization</u>", "<u>international ama-</u>
<u>teur athletic competition</u>", and "<u>national governing body</u>" have
the meanings given the terms in <u>section 220501(b) of title 36</u>;
and
**(12)** the term "as soon as possible" means within a 24-hour peri-
od.
(d) Agency designated to receive report and action to be taken

For all Federal lands and all federally operated (or contracted) facilities in which children are cared for or reside and for all covered individuals, the Attorney General shall designate an agency to receive and investigate the reports described in subsection (a). By formal written agreement, the designated agency may be a non-Federal agency. When such reports are received by social services or health care agencies, and involve allegations of sexual abuse, serious physical injury, or life-threatening neglect of a child, there shall be an immediate referral of the report to a law enforcement agency with authority to take emergency action to protect the child. All reports received shall be promptly investigated, and whenever appropriate, investigations shall be conducted jointly by social services and law enforcement personnel, with a view toward avoiding unnecessary multiple interviews with the child.

**(e) Reporters and recipient of report involving children and homes of members of the Armed Forces**
**(1) Recipients of reports**
In the case of an incident described in subsection (a) involving a child in the family or home of member of the Armed Forces (regardless of whether the incident occurred on or off a military installation), the report required by subsection (a) shall be made to the appropriate child welfare services agency or agencies of the State in which the child resides. The Attorney General, the Secretary of Defense, and the Secretary of Homeland Security (with respect to the Coast Guard when it is not operating as a service in the Navy) shall jointly, in consultation with the chief executive officers of the States, designate the child welfare service agencies of the States that are appropriate recipients of reports pursuant to this subsection. Any report on an incident pursuant to this subsection is in addition to any other report on the incident pursuant to this section.

**(2) Makers of reports**
For purposes of the making of reports under this section pursuant to this subsection, the persons engaged in **professions and activities described in subsection** (b) shall include members of the Armed Forces who are engaged in such professions and activities for members of the Armed Forces and their dependents.

**(f) Reporting form**
In every federally operated (or contracted) facility, on all Federal lands, and for all covered individuals, a standard written reporting form, with instructions, shall be disseminated to all mandated reporter groups. Use of the form shall be encouraged, but its use shall not take the place of the immediate mak-

1   ing of oral reports, telephonically or otherwise, when circum-
    stances dictate.

2
    **(g) Immunity for good faith reporting and associated actions**
3   All persons who, acting in good faith, make a report by subsec-
    tion (a), or otherwise provide information or assistance in con-
4   nection with a report, investigation, or legal intervention pur-
5   suant to a report, shall be immune from civil and criminal lia-
    bility arising out of such actions. There shall be a presumption
6   that any such persons acted in good faith. If a person is sued
    because of the person's performance of one of the above func-
7   tions, and the defendant prevails in the litigation, the court
8   may order that the plaintiff pay the defendant's legal expenses.
    Immunity shall not be accorded to persons acting in bad faith.
9
    **(h) Training of prospective reporters**
10  All individuals in the occupations listed in subsection (b)(1)
11  who work on Federal lands, or are employed in federally operated
    (or contracted) facilities, and all covered individuals, shall
12  receive periodic training in the obligation to report, as well
    as in the identification of abused and neglected children.
13
    **(i) Rule of construction**
14  Nothing in this section shall be construed to require a victim
15  of child abuse to self-report the abuse.

16  (Pub. L. 101-647, title II, § 226, Nov. 29, 1990, 104 Stat.
    4806; Pub. L. 114-328, div. A, title V, § 575(b), Dec. 23,
17  2016, 130 Stat. 2142; Pub. L. 115-126, title I, § 101(a), Feb.
18  14, 2018, 132 Stat. 318; Pub. L. 116-189, § 10, Oct. 30,
    2020, 134 Stat. 970.)
19
20  **END OF LAWS SECTION**

21
22  By law, I am a "Commercial Film and Photo Processor", and there-
    fore a "Covered Professional" under 34 U.S. Code § 20341 - Child
23  abuse reporting, and in fact, I am IMMUNE to prosecution for do-
    ing so.
24
25  Therefore, according to these mandatory reporting laws, espe-
    cially as a professional film processor, which I indeed am, as
26  is verifiable by my imdb page, as well as my professional re-
    sume, I MUST document and report child abuse, or face up to 6
27  months in jail.

28  IMDB PAGE - https://www.imdb.com/name/nm4290084/?ref_=fn_al_nm_1

1

2   **PROFESSIONAL RESUME - SEE BELOW**

3   Therefore, according the laws Ive stated above, not only do I
    have full immunity from prosecution and punishment for making,
4   processing, placing and sharing these documentary films and
    video, Judge Moor in this instance is not even a judge, but a
5   minister, and therefore has no right to make any demands, much
    less that to demand that I remove or censor these videos.
6

7   In fact, by withholding contact with my children, he is continu-
8   ing the act of kidnap and ransom, and acting in the capacity of
    not a judge, but as Mr. Moor, and therefore has opened himself
9   as prosecution as a person, and removed his judicial immunity.

10
    Therefore, I have complete immunity from Judge Moor's unlawful
11  orders that has continue to exasperate the kidnapping and ransom
    of my children, which was set forth by the unlawful orders of
12  Judge Akbarali of Canada, and Judge Kristjanson of Canada, all
13  impersonating judges while acting as "ministers".

14  It is fortunate for our case that Judge Moor has the financial
15  resources to at least pay a part of our criminal and civil
    claims against him for continuing to withhold my children in the
16  criminal act of kidnapping and ransom that began 4.5 years ago
    and is ongoing.
17

18  **SIR PHILIP DRURY MOOR** (aka Mr. Moor) - ACTIVE - Director ID is
    913981133 And address is Royal Russell School Coombe Lane, Croy-
19  don, CR9 5BX

20
    Has 3 companies of a Total net worth of £18.5 million UK Pounds
21  Sterling.

22
    Furthermore to the argument above, the 'Sir' Title of Mr. Philip
23  Drury Moor, plus the fact that he works for the Crown of Eng-
24  land, Plus his personal wealth, Plus his title as a QC Justice,
    indicates a level or privilege and 'nobility,' and since 1628,
25  there have been laws in place in England to prevent such nobili-
26  ty from unlawfully confiscating the property of commoners.

27  As I have explained in the prior pages, under the Common Law of
    England, the children are my property.
28

1   The _Petition of Right_ was a series of laws put in place and
passed on June 7, 1628, to protect against the unlawful seizure
2   of property by such powerful individuals that are the crown,
working with the crown, or subject to the crown, and to cause
3   for the immediate return of unlawfully confiscated property back
to the individual(s) and or entities that such property was un-
4   lawfully confiscated from. _The Petition of Right remains in_
_force in the United Kingdom,_ and parts of the Commonwealth. It
5   reportedly influenced elements of the Massachusetts Body of Lib-
erties, and the Third, Fifth, Sixth and Seventh amendments to
6   the Constitution of the United States.
7
8   - The Petition of Right, passed on 7 June 1628, is an English
constitutional document setting out specific individual pro-
9   tections against the state, reportedly of equal value to
Magna and the Bill of Rights of 1689.[3] It was part of a wider
10   conflict between Parliament and the Stuart monarchy that led
to the 1638 to 1651 Wars of Three Kingdoms, ultimately re-
11   solved in the 1688 Glorious Revision.
12
13   THEREFORE, Judge Moor, known as Mr. Moor in this case, has NO
LEG TO STAND ON and his orders are null and void.
14
15   **VEM's PARTIAL PROFESSIONAL RESUME AS "COMMERCIAL FILM PROCESSOR"**
16
17
18   ## Filmography                    Edit filmography | Filter by profession ⌄
19   6 titles
20   **Past Television (6 titles) ⬍**                                    **Episodes ⬍**
21   Payday (2016)                                                        1
(TV Series) - Executive Producer (1 episode, 2016)                      ⋮
22   Toronto (Dec 30, 2016) Season 1, Episode 8 - Executive Producer
23   G-Thing (2013)                                                       6
(TV Series) - Executive Producer (6 episodes, 2013), Director (5 episodes, 2013)
24   Beefin' (Jul 31, 2013) Season 2, Episode 1 - Executive Producer
25   Sensitive Italian Male (Aug 31, 2013) Season 1, Episode 6 - Director, Executive Producer
G Is Shot (Aug 17, 2013) Season 1, Episode 4 - Director, Executive Producer
26   Goomahs (Aug 10, 2013) Season 1, Episode 3 - Director, Executive Producer    ⋮
Beefin' (Jul 31, 2013) Season 1, Episode 2 - Director, Executive Producer
27   I Need a Plane (Jun 2013) Season 1, Episode 1 - Director, Executive Producer
28

1
2
3
4
5

| Commercials (1 title) | Role / Position | Company / Director |
|---|---|---|
| Sixt Rent A Car "Hip Hop" * | Director | Sweatshop Media / Cobblestone Pictures |

| Print (1 title) | Role / Position | Company / Director |
|---|---|---|
| HollyVOOD comic book * | Writer | Vem's Sweatshop Media |

| Television (3 titles) ⇕ | Role / Position ⇕ | Company / Director ⇕ |
|---|---|---|
| Wheelin & Dealin (Aka "Driven" * | Creator / Executive Producer | Electus / Vem's Sweatshop Media / 5 by 5 |
| Harvest * | Creator / Executive Producer | Kinetic Content / Vem's Sweatshop Media |
| Disclosure * | Consulting Producer | Vin DI Bona Productions / Fishbowl Media |

| Video (10 titles) ⇕ | Role / Position ⇕ | Company / Director ⇕ |
|---|---|---|
| Skindred "Pressure" * | Director | DNA Productions |
| Trey Songz "Gotta Go" * | Director | DNA Productions |
| Five For Fighting "The Riddle" * | Director | DNA Productions |
| Jerry Seinfeld "Bee Movie" Music Video * | Director | The Artist's Company |
| O.A.R. "Love and Memories" * | Director | The Artist's Company |
| Authority Zero "Revolution" * | Director | DNA Productions |
| The Click Five "Just the Girl" * | Director | DNA Productions |
| John Mayer "Say" * | Director | The Artist's Company |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FULL TIMELINE - Background to the matter leading to May 15, 2018**
- On October 15, 2016, one month after I asked for a divorce from Sonia Helen Gulian, she kidnapped our children Child S and Child V with the help of her parents Antony and Zvart Gulian, from their home in Toronto, Canada, and brought them to London, England.
- I immediately went to the police and reported the kidnapping, and filed for a Hague Application for the children's return to their last place of habitual residence, which was Toronto, Canada.
- Through various forms of legal maneuvering via the law firm Dawson Cornwell, as well as multiple corrupt and perjury laden tactics for the sake of extending what should have lasted 6 weeks per the Hague Application, into 22 months, immense delays were created by Sonia Helen Gulian, Zvart Gulian, and Antony Gulian.
- The Honorable Judge Mark Rogers was extremely critical in his decision toward Sonia Helen Gulian. He accused Sonia Helen Gulian of conducting "a war of attrition" with the goal of "impeding transition" back to Toronto, Canada.
- The Honorable Judge Mark Rogers also stated "I have broadly accepted the father's approach finding the submissions on his behalf to be more persuasive."
- The Honorable Judge Mark Rogers continued to describe the behavior of Sonia Helen Gulian "I had the strong sense of her continuing the battle in the post judgement phase, making at times unnecessary sweeping or restrictive demands, with the object of dealing or impeding the transition".
- The Honorable Judge Mark Rogers continued to describe the behavior of the mother when he was formulating a Scott Schedule, a document aimed at giving the mother financial sums for the transition back to Toronto, Canada.
- The Judge comments "I am sorry to say that the mother's approach was highly unrealistic. The extravagant claims went far and beyond what I regard as reasonable, as a stop gap provision."
- The Honorable Judge Mark Rogers goes on to state about Sonia Helen Gulian's behavior "I end on a slightly sour note. I was pressed for a response and I make no criticism of anyone for that. I apologize for the delay, which will have frustrated the father in particular. However, I feel entitled to comment that the many areas of minute dispute that the post judgement phase has generated may be regarded <u>as disproportionate or indicative</u>

<u>of an ongoing war of attrition</u>. I was furnished with far more materials than I had anticipated, or indeed permitted and a number of unprompted additional emails supplying further information piecemeal. It made my task unnecessary complicated and, in part, caused delays as I had to set aside a longer period of time than I had expected."

- The Honorable Judge ends with "I urge the parties to end their personal antagonism and concentrate upon their much loved children."

- Regardless of the Honorable Judge's comments on November 8, 2017, Sonia Gulian continued with her bad behavior, disregarding the Judge's order, which occurred at the 11 month mark after I had submitted for a Hague Application.

- These comments by the Honorable Judge about Sonia Helen Gulian's behavior occurred at the 13th month mark, after I had submitted for a Hague Application.

- Following this court order, Sonia Helen Gulian continued her bad behavior by attempting a staged Suicide Incident on December 11, 2017, which was aimed at further "delaying and impeding the transition back to Toronto, Canada."

- HH Judge Rogers noted that, "during 10-week period of negotiations as to terms of order, no point or information was raised on behalf of the mother with respect to her Medical Situation and that even as late as 11 December significant matters were being discussed in relation to immigration and the practicalities of that, before out of the blue, on December 13 the mother's solicitors wrote to inform the other side of 'a significant and material change in our client's current psychological health, and medical advice received by her.'"

- Sonia Helen Gulian had reported that she had stuck a bottle full of pills into her mouth in December 2017, which her mother had to pry out, and the Honorable Judge Rogers called this event "ridiculous".

- After waiting until the absolute last minute, Sonia Helen Gulian then filed for appeal, and was granted one in February/March of 2018, which was scheduled for a court date of May 15, 2018.

- This appeals was granted under false testimony, as Sonia Helen Gulian did not let the judge know that she had been having an affair with Martin Avedian since the abduction of the children on October 15, 2016.

- The reason for this omission is clear, since the diagnosis of Moderate to Severe PTSD is not compatible with somebody who has an active social life, goes to spas, and spends a lot of time with her love interest, Martin Avedian.

1   - It is important to note that she is still with Martin Avedian,
      and she had been with him prior to our marriage in 2000, as
2     childhood sweethearts.
    - May 15, 2018, This is the day I arrived into the UK for a 14
3     hour stay, in order to attend the appeals hearing, see my chil-
      dren for a couple of hours, and then fly back home.
4   - It is important to note that my presence in the court was not
      mandatory, but I had made it a point to be at every single
5     court hearing since the abduction of the children on October
6     15, 2016, in order to show my face to the Judge, and do the
      best I could do to restore sanity for the sake of the children
7     and I.
8   - I did this at a great expense to myself, and I had no idea that
      this matter would drag out for 22 months, as I was told that
9     Hague applications for International abduction are supposed to
10    resolve within 6 weeks before the children are returned back
      home.
11  - Unfortunately, my determination to be a good father and present
12    myself to the court during a 22 months "war of attrition"
      drained me of much needed finances when this court battle land-
13    ed in Toronto, Canada, and placed me at a grave disadvantage
      there, as Sonia Helen Gulian continued her well funded "war of
14    attrition" on Canadian soil, and repeated these exact same al-
15    legations that she had made throughout the 22 month Hague
      process, which were discredited by the UK Courts, only with my
16    ability to fight back severely damaged due to the draining 22
      months.
17

18
**May 15, 2018**
19  - I flew into London this morning and immediately went to the
      court room as legal arguments for the appeal were heard.
20  - The Appeals court was lead by Lord Coulson, Lord Gross and Lord
21    McFarlane.
    - I made it into the court room around 9:45 AM London time.
22  - I watched as the Lords of the Appeals court listened to the ar-
23    guments of Sonia Gulian, and completely rejected her arguments
      and saw no merit in her reasons for wanting to overturn the de-
24    cision of the Honorable Justice Mark Rogers.
    - The Lord Justices did not bother to listen to my side, as they
25    found it unnecessary, and in fact seemed bewildered as to why
26    an appeals had been granted, since Sonia Helen Gulian was
      clearly in the wrong.
27  - As stated above, Sonia Helen Gulian had only succeeded in get-
28    ting an appeals by leaning heavily on a false PTSD diagnosis

1  while omitting the fact that she was having an affair with Mar-
   tin Avedian since the start of the kidnapping in late 2016.
2  - This court date resulted in further harsh comments upon Sonia
   Helen Gulian's behavior, and the Lord Justices stated that if
3  she decided not to return with the children to Canada, then I
   could collect the children and return without her.
4  - Lord Justice Gross. Lord Justice McFarlane and Lord Justice
5  Coulson state: "The Order Required two children concerned, a
   girl now aged 10 years and boy now aged 7 years, to be returned
6  to Ontario, In Canada, their home state where, it was accepted,
   they·had been wrongfully removed by their mother in October
7  2016."
8  - Lord Justice McFarlane: "Asserting under Article 13 (b) that
   there was a grave risk that return of the children to Canada
9  would expose them to physical or psychological harm or place
   the children in an otherwise intolerable situation. In the
10 event, the "children's objections" exception lacked real sub-
11 stance on the evidence, and was readily dismissed by the judge.
   Exception turned upon the mother's psychological and emotional
12 wellbeing. Having heard oral expert evidence and full submis-
13 sions, at the end of a five day hearing, the judge rejected the
   mother's article 13 (b) objection."
14 - Lord Justice McFarlane: "Despite the fact that the father's
15 Hague application was made promptly after the children's re-
   moval from Canada in October 2016, it is apparent that a wholly
16 disproportionate and unacceptable degree of delay occurred, re-
   sulting in the final hearing taking place some 11 months after.
17 - Lord Justice McFarlane: "Despite the clear decision of the
18 Judge on 8 September, it is also of great concern to note that
   protracted negotiations then followed (H. Mark Rogers has
19 clearly stated this was the Defendants doing) between the par-
   ties as to the terms of the order, with the result that the
20 judge was required to adjudicate upon issues of drafting, be-
21 fore the court order could be sealed on November 22, 2017".
22 - Lord Justice McFarlane: "HH Judge Rogers (ENGLAND) went on to
   consider the event that had taken place following the September
23 (2017) hearing. He was critical of the stance adopted by the
   mother, which was that she would not begin any step to apply
24 for a visa until the final sealed version of the court order
   was available, describing her stance as 'ridiculous.'"
25 - Lord Justice McFarlane: "HH Judge Rogers, He held that the
26 mother's position was "Indicative of a lack of good faith in
   taking the necessary steps to make the matter move forward."
27 - Lord Justice McFarlane: "HH Judge Rogers, More generally, and
28 in like terms, he was critical of the "Unreasonable stance tak-
   en (by the Defendant) that none of the relevant practical steps

1   could be taken <u>until final form of the order was agreed and
2   sealed.</u>"

- I left the courtroom that date of May 15, 2018, hoping that af-
3   ter these two massive losses in court, the behavior of Sonia
    Gulian and her family, as well as their law firm Dawson Corn-
4   well, would improve.

- <u>Sadly, that was not the case, and what followed on this date of
5   May 15, 2018 was multiple attempts at having me arrested, and
    staging false incidents with the goal being to continue the
6   conspiracy to commit kidnap my children, and remove all my civ-
7   il rights, under the color of law.</u>

**The May 15, 2018 "Nando's Incident"**
8
- I have a good amount of video evidence from this date that is
9   essential viewing in order to decipher the truth from perjury
    and fiction.
10
- <u>The reason why this footage is so important is because this was
11   the one event that Judge Akbarali used exhaustively in her 2
     decisions in Canada, and mentioned this "one instance of trou-
12   bling behavior before a social worker" and its implications, on
     10 different occasions in her decisions of June 26, 2018, and
13   September 11, 2018, to justify the return of the children to
     the UK.</u>
14
- CAFCASS and Brent Social Services had stated that I was a "very
15   hands on father", and the children felt extremely comfortable
     with me.
16
- This was paralleled with the documents from Brayden Social Ser-
17   vices during the 3 months in Canada starting on June 18, 2018,
     and ending in September 18, 2018
18
- The video footage from this date May 15, 2018, presents an
19   identical report that perfectly matches the CAFCASS testimony,
     with the children being extremely comfortable and at ease
20   around me.

- Brayden social services in Canada also noted the same, and even
21   went as far as to state that the mannerisms of Child S become
     more "normal" and calm the more she spends time with her fa-
22   ther.

- Brayden Social services in Canada also noted that Child S would
23   give her father unprompted hugs throughout the visits, and that
     Child V would say things like "you're the best daddy ever."
24
- Even Andrea Himel, who I believed was a corrupted choice for
25   the Voice of the Children's report, stated that Child S was
     calm and peaceful in my presence, yet anxious around the moth-
26   er.

27     - It is important to note that Judge Akbarali gave her decision
         on September 11, 2018, and the Voice of the Children's report
28

1   was appointed on September 12, 2018, after Judge Akbarali's decision.

2   - Andrea Himel was also chosen by the mother Sonia Helen Gulian, and Himel positioned herself as simply going along with

3   Judge Akbarali's decision, and in fact, when Child S had a breakdown in front of her, she closed her ears and ran out

4   the door, as she was fearful not the rock the boat with Judge Akbarali's predetermined decision.

5   

6   - The child also stated to the VOC reporter that she would like to live in LA, which is where I have lived most of my life, and

7   where she was born and raised, as was her bother, and therefore she associates LA with me.

8   - It is very important to note that Judge Akbarali used the social workers version of events of May 15, 2018 via his affi-

9   davit, and did not look at the footage that is available to

10  Your Honor.

    - In fact, she stated in her decision of September 11, 2018, that

11  she did not view the footage, and yet stated that she found the social worker to be credible, rather than whatever I happened

12  to have on video.

13  - The camera does not lie, and I assure Your Honor, that if you take the time to view this footage, you will see that the affi-

14  davit of Arthur Gajewski is fiction and perjury, through and

15  through.

    - Therefore, I submit this case with a separate Lawsuit against

16  Arthur Gajewski and Conspirators, the social worker in question

17  from this date, which details the events of May 15, 2018, with actual evidence that shows the social worker to be lying.

18  - My statement about this day's events has always been the same.

    - The Social Worker Edyta Leksander (employee of Arthur Gajewski)

19  came in late, and made no attempt to introduce herself to the children. She didn't apologize for being late.

20  - While Edyta Leksander was cheery and smiling when speaking with

21  Zvart Gulian (maternal grandmother and kidnapper), she became serious and mean looking while sitting less than 2 meters away

22  from the children, and staring at us in a cold stalking fash-

23  ion.

    - Child S is a special needs child with anxiety, and does not

24  warm up to people easily and without adults making an effort.

    - An adult staring at her in a stalking fashion is especially

25  troubling to her, and caused her to be brewing with anxiety

26  during the first hour of contact, until I was able to step in and fix things.

27  - I was up 33 hours straight, as I had been up 24 hours by the time I got to London from North America, and I went right into

28  court at 9:30-9:45 AM, and then this contact was at 4:45 PM. In

my severe physical and emotional exhaustion, the last thing I imagined Id be doing was a social workers job.

- Edyta Leksander made no effort to introduce herself to the Children when she arrived. She simple sat at a table very close to Child S, and stared at the children in a stalking and cold fashion.
- This made Child S nervous, and she left the table on 30+ occasions, and stayed at a distance, and I had to reel her back in every single time.
- Child S kept complaining about Edyta Leksander, asking "why is she staring at me?" "who is this lady?" "why is she here?"
- I told the child that "your mother wanted her to be here", and the child became flustered further.
- Eventually, I raised my phone camera to show how Edyta Leksander was staring coldly and in a stalking fashion, and therefore making Child S uncomfortable.
- I even stated to Edyta on video "Look, Im going to film this because she's getting nervous, and I don't want you going back and saying bad things about me."
- During this moment, I started to speak with the child in Armenian for the first time, which is a moment that Arthur Gajewski, the head of the Social Worker agency, mentions in his emailed statement to Dawson Cornwell of May 16, 2018.
- It is very helpful that Arthur Gajewski stated this moment, as we have a time lock here, and can follow the 20 minutes of footage following it, to compare it with the point by point chronology that Arthur Gajewski submitted to Dawson Cornwell.
- I have always contended that the only thing that happened after this momentary switch to the language Armenian was:
  - Child S continued to expressed anxiety about this stoic lady "Who is this lady," "Why is she here?"
  - Next, Child S and I had banter about being happy, and not worrying about "adult stuff", which is a topic she brought up.
  - Next, I tried to convince Child S to say hi to the social worker, and make eye contact so she could become comfortable
  - Child S refused to do this three times, and then finally introduced herself to Edyta Leksander.
  - In short, Child S and I had to do the social workers job for her, and the inability of the social worker to do the same resulted in a good 45 minutes being wasted on making the child uncomfortable.
  - They made a big deal about the child and I speaking Armenian, which I found to be quite racist and unacceptable.
- Arthur Gajewski presented a whole different set of fictionalized events that do not make sense when one views the footage.

1  - He stated that upon my switch to Armenian, Child S "burst out into tears".
2  - Following this, Arthur Gajewski claims that I began yelling at the social worker.
3  - When Your Honor sees the footage, you will find that no such thing happened.
4  - You clearly see the child's face, dancing and having a good time, and her face is fresh and happy, not akin to a child who has just "burst out into tears". (timecode 17:30 is the dancing, and prior to that the child is simply having curious and happy banter with me)
7  - If any such thing had occurred, you would see it on the child's presentation, you would hear it in the footage.
8  - There is not even a hint of the child having cried a tear.
9  - Nor is there any hint that I raised my voice and acted unruly toward the social worker.
10 - I have covered this falsified event in great detail in the attached case, if Your Honor would like to see further evidence.
12 - In regards to the video evidence:
13   - First, here is some footage of "Hanging out with the children at Nando's", where you see the children's warmth and comfort with me, and about 2:19 minutes of pieces stung together where there is no crying or any event close to what Arthur Gajewski described. https://youtu.be/sEnwo6bvjfM
16   - Second, here is Zvart Gulian leaving Nando's right after she claims she was assaulted by me, and that I thrust a table into her chest, which caused a "large bruise and gashing", and left her "very traumatized". All of these false claims are available in the rejected Metro police report. https://youtu.be/AYeJKHVkAck
20   - Arthur Gajewski, the head of the social worker agency, emailed Dawson Cornwell a play by play account of what he claims happened in Nando's after the key moment where I started speaking with Child S in Armenian for the first time.
23   - Its clearly indicated that this is the first time as I ask the child "Do you remember Armenian?" (in Armenian). This locks with Arthur Gajewski's chronological account, as he states "The Father then reverted to another language", also indicating that this was the first time that I spoke to the child in Armenian.
26   - Arthur Gajewski then presents a chronology that is vastly different than what the video/audio captures. The video/audio is 20 minutes in length, and you hear Child S perfectly fine, and by 17:30 in the timeline, the child is dancing

1   and happy, and her face looks clean, and not like a child
2   who has just "burst into tears", as Arthur Gajewski so
    falsely and fraudulently claims.

3   – Here is the exact Chronology of events that Arthur Gajewski
    claims happened in his email to Sonia Helen Gulian's solicitors
4   Dawson Cornwell on May 16, 2018, where he recounts his timeline
    of what happened:

5   – "The father then reverted to another language which the FSW
    could not understand, and spoke directly to his daughter. The
6   girl soon burst out in tears, evidently upset. Her brother
    told the father he could not understand what he was saying.
7   Meanwhile the FSW texted me to alert me to the situation. I
8   asked her to tell the father to call me."

9   – "So the father called me and he sounded quite upset."

    – "He presented in an aroused emotional state and it was not
10  easy for me to get a word in."

    – "The FSW texted that the father changed the tables and I di-
11  rected her to follow the family as per our procedures."

12  – "The FSW texted to say the father continued to shout/use a
    loud voice and was noncooperative."

13  – "Given the circumstances and having concluded the situation
14  was deteriorating to the point of placing the children at
    risk of emotional harm, I texted the FSW instructing her to
15  end contact."

16  – "I asked the FSW to call the police if the father became more
    unstable and/or threatening."

17  – "I called the mother and asked her to send the escort to col-
    lect the children. She asked me to call the police but I said
18  we would do it only if we determined it necessary."

19  – "Meanwhile, the FSW told the father she was instructed to end
    contact and that family members were en route to collect the
20  children."

21  – "The father was very unhappy about this and got on the phone
    with his solicitor. He continued to be very loud. He was
22  threatening to sue AGFS for this."

    – As Your Honor will see and hear in this video, the child did
23  not cry. She did not burst into tears, and I certainly did not
24  yell or raise my voice.

    – The Social Worker says that I was "aroused and erratic", yet he
25  did not call the police.

    – I contend that the reason he did not call the police is because
26  the police would have provided a completely different account
27  that would reveal the Social Worker's corruption and lies of
    this matter.

28

1  - Due to a social worker oath and constitution, it is reprehensi-
   ble to not call the police if somebody is acting truly in an
2  "erratic" manner in front of children, in a family restaurant
   like Nando's.
3  - Instead, this social worker claims to have called the lawyers
   Dawson Cornwell, and Sonia Helen Gulian, which makes little
4  sense if an adult male of 6 foot 1 inches is acting in a
   "aroused and erratic" fashion, in the middle of a family
5  restaurant like Nando's.
6  - Of course, no managers, nor the security of Nando's reported
   such events, as they never happened.
7  - In fact, as I stated above, when you see the child's face at
8  timecode 17:30, she is dancing, and there is not even a hint
   that she has cried nor been upset, as her face is fresh, clean,
9  and happy looking.
10 - This video below shows Child upset at the social worker, her
   only cause of concern, followed with friendly banter between
11 the children and I, followed with the child introducing herself
   to the social worker, followed with the child dancing and being
12 happy with no indication she has been crying: https://youtu.be/
13 q8Cp-050VwU

14

15 - The Honorable Mark Rogers was the Judge on this matter of the
   Hague International abduction, and the children's return, which
16 was a five day hearing, cumulating in his decision on September
   7, 2017, which was to return the children to their last place
17 of habitual residence, which was Toronto, Canada.
18 - Following the Honorable Judge's decision, Judge Mark Rogers
   were bombarded by countless emails and other forms of resis-
19 tance from the Defendant and her firm, Dawson Cornwell, who
   sought to overturn the decision.
20 - These forms of resistance failed to compel the Honorable Judge
21 Mark Rogers, and in December 2017, the Defendant had an "at-
   tempted suicide" event, which as his notes indicate, he did not
22 find to be credible, called her "ridiculous", and was simply
   another attempt at contempt of Your Honor's order.
23 - Following this, Sonia Gulian filed for an appeal at the last
24 possible moment.
   - An Appeal was heard by Three Lord Justices of the Appeals Court
25 on May 15, 2018.
26   - It is important to note that on this day, I was scheduled
     to see the children for 2 hours, during which Sonia Helen
27   Gulian and her mother Zvart Gulian staged an incident at a
     Nando's that was aimed at reversing the Hague return.
28

1   – The Appeals Judges were also highly critical of the behavior of
      Sonia Helen Gulian, and without hearing arguments from my side,
2     they enforced Judge Mark Roger's order and provided harsh com-
      mentary upon the behavior of Sonia Gulian in delaying a Hague
3     Application that should have been 6 weeks, into 22 months.
4   – Sonia Gulian was ordered to return to Canada with the children
      on June 14, 2018.
5   – Sonia Gulian breached this order, because the weekend of June
      14, 2018 coincided with "father's day", and the birthday of her
6     lover Martin Avedian. My children reported to me that they had
      a birthday and fathers day celebration on June 16, 2018.
7   – It is important to note that we have evidence that while Sonia
8     Helen Gulian was lying to the court and saying she had PTSD,
      she was seen having an affair with Martin Avedian in December
9     2016, just two months after she kidnapped the children from
10    Canada. This would not make sense with her claims before the
      court, as she reported herself to be depressed with Moderate to
11    Severe PTSD, and unable to have such an affair.
12  – To remind the court of some of the evidence that was presented
      before the Honorable Judge Mark Rogers in September 2017, we
13    had a PI report that followed Sonia Helen Gulian for a month in
      April 2017, where we captured her going to a 5 day luxury spa
14    getaway, 3 of these days with her boyfriend Martin Avedian, and
15    having a very active social life, that was not indicative of
      somebody suffering moderate to severe PTSD.
16  – It is important to note that she is still with Martin Avedian,
      and they were boyfriend / girlfriend in their teenage years. So
17    this has been a connection that has existed prior to my mar-
18    riage with Sonia Helen Gulian.
19  – We did not present to the court that she traveled over 400
      miles in just one month as an unemployed person, while the av-
20    erage travel of a employed person in a month is 520 miles, in-
      dicating that she was very active for someone claiming to be
21    downtrodden with moderate to severe PTSD.
22  – Additionally, we presented evidence that Sonia Helen Gulian had
      helped me and another TV producer research for a series about
23    PTSD Fakers in March of 2017. We had found a literal checklist
      of how to fake PTSD on her computer, date marked March 2017,
24    which is attached here to the bundle as evidence.
25  – It is also important to note that on September 29, 2016, she
      went into a doctor's office in Toronto, Canada, and demanded a
26    PTSD diagnosis. She was rejected and told that she is just
      "mildly anxious" because of her marital issues.
27  – It is also important to note that after abducting the children
      on October 15, 2016 from Canada and bringing them to the UK,
28    she enrolled them into school on November 22, 2016.

1  - The kids were out of school for an entire 5 weeks.
2  - It is also important to note that on November 22, 2016, she went to a doctor who has a relationship with her law-firm Dawson Cornwell, and this was a meeting set up by this law-firm,
3  and she was successful in attaining a PTSD diagnosis.
4  - It is also important to note that I have run a Private Administrative Process on this doctor who gave Sonia Helen Gulian the
5  PTSD diagnosis, and he is refusing to respond to any questions and has asked Dawson Cornwell for assistance toward my pending
6  legal action against him.
7  - Finally, it is important to note that Dr Farnham, the expert witness that we brought in, whom the court found credible,
8  stated that PTSD is fully self diagnosed, and easily feigned by a determined party.
9  - Dr. Farnham also stated that the he did not believe that Sonia
10  Helen Gulian was suffering from PTSD.
    - It is also important to note that 3 days before abducting the
11  children, she went into a lawyers office on October 12, 2016,
12  to tag the home as "matrimonial", so I could not sell it even if I tried.
13  - Is is also important to note that 1 day before abducting the children, she went into a police station in Toronto on October
14  14, 2018, to file a domestic violence report. The file was
15  dropped just a day later due to lack of evidence.
    - Back to June 2018: Sonia Gulian breached the court order for
16  return to Toronto, Canada, on June 14, 2018. After threats of further legal action, Sonia Gulian returned to Toronto, Canada
17  with the children on or around June 18, 2018.
18  - On June 23, 2018, I was scheduled for contact with the children. Sonia Gulian refused to hand over the children, one of
19  the reasons being that I was not present for the exchange.
20  - In the UK, Sonia Helen Gulian had insisted on a non molestation order, for me to be 500 yards away from her at all instances.
21  - On this date, June 23, 2018, I felt that she was trying to entrap me, so I stayed away from the exchange. I let the exchange
22  proceed at it had in London fro 22 months, where my mother
23  would meet with her and or her father, to collect the children.
    - Her attorney wrote a letter to my attorney on June 23, 2018,
24  insisting that I be present at the next exchange, or they would not hand the kids over. I would be within 2 yards of her, which
25  I found rather strange after her insistence for 22 months in
26  the UK on an order that I stay within 500 yards of her.
    - On June 24, 2018, I was present at the next exchange, and col-
27  lected the children for overnight contact.
28  - On this date June 24, 2018, my daughter Child S told me that she was scared of her grandmother Zvart Gulian, who had been

1   "mean" to her and "slapped" her, and yelled at her on numerous
    occasions. There is abundant evidence that the child has been
2   assaulted by her grandmother Zvart Gulian before. She was wor-
    ried because this abusive grandmother was scheduled to arrive
3   in Canada shortly.

4   - It is important to note that the child had made such allega-
      tions on numerous occasions, which I list here below.
5   - The videos from May 15, 2018, as well as a litany of such ev-
      idence, captures the comfort and closeness of the relation-
6     ship I share with the children, which is also reflected in
7     the CAFCASS report and the testimony of CAFCASS officer John
      Powers, as well as the Brent Social Service report in the UK,
8     as well as the Brayden Reports from Canada, where the social
      worker comments that "Child S strange behavior settled down
9     the more time she spends with her father."

10  - I also attach a video that covers some of these allegations
      of assault and abuse against a child minor.
11  - We hear the child being is assaulted by her grandmother.
12  - We also see the child looking very drugged on many occa-
      sions.
13  - We see the child's entire character changing due to her
      kidnapping and abuse.
14  - This following is an UNLISTED video, aimed at the audience
15    of a select number of experts, lawyers, children's welfare
      experts, for the sole purpose of helping me with this dif-
16    ficult legal matter that has been strewn in controversy and
      contempt since the moment this matter left the UK courts in
17    June 2018.
18  - The URL Is https://youtu.be/ Aq7MFAdB1A, and it contains a
      32 minute video that clearly shows all my concerns of child
19    abuse to be true, honest and accurate. Please Your Honor ,
      I ask that you watch this video if you have any doubt as to
20    what I am stating.
21  - Your Honor will see the presentation of the child going
      from being open and confident, to shriveling up like a
22    raisin, whenever in the company of her maternal grandpar-
23    ents and mother.
    - Child S has always stated that her grandmother has assaulted
24    her and treated her in ways that are humiliating, destructive
      and dangerous, especially for a highly sensitive child with
25    special needs.
    - In March 2017, she stated that her grandmother would assault
26    her inside a bathroom, and lock the door behind her as she
27    was left inside crying. There is audio that capture Child S
      making this admission "My grandma slapped me!" at this link.
28

- In April 2017, Brent Social Services confirmed that Child S stated to them also that she was assaulted by her grandmother.
- Following this, the appearance of Child S began looking like she was put on some kind of drug that resembles a "date rape" drug, as expert doctors and drug interventionists have attested to in letters contained within this bundle.
- Child S brought up the topic of "Pills" on numerous occasions over the next year leading up to June 18, 2018.
- Every time she brought up this topic, the Skype session was disconnected, and I was not able to find out more information.
- On June 24, 2018, when the child was in my care, she began repeating these same claims of being assaulted and mistreated by her maternal grandmother, who she feared would do the same upon her arrival into Canada, which she told me was a "few days" from this contact.
- On June 24, 2018, I went to the Children's Aid Society of Toronto to report this claim of assault against a child minor, and was told that if I was concerned about the child's welfare, I should hold on to the child until I was before a judge to explain the problems at hand.
- I also spoke with the Toronto Police on June 23, 2018, after the issue with the exchange on that date, and was told exactly the same thing.
- I also spoke with the Toronto Police on June 25, 2018 about this matter, and was told the exact same thing.
- For one night, I over-held the child on June 25, 2018, as I could not bring myself to returning her into the hands of abusers when she felt secure with me.
- On September 1, 2018, Child S told a social worker from Brayden Social Services in Toronto that "Vartan asked me what is wrong with me. Before Grandma Zvart and Mummy were shouting at me and slapping me."
- The child then grabbed a piece of paper, and wrote the same "Before Grandma Zvart and Mummy were shouting at me and slapping me."
- In addition, we have recorded evidence from February 25, 2018, where the child is clearly heard being assaulted and yelled at by her maternal grandmother.
- Furthermore, we have evidence from this same date February 25, 2018, in the affidavit of Jeffrey Wright, who overheard the child being assaulted and yelled at repeatedly.
- We also have some recorded evidence that was caught on audio of this assault.

- It is important to note that when Brent Social Services was told by Child S that she was being assaulted by the Grandmother in April 2017, they asked the Grandmother and mother to sign safeguarding agreements, which she refused.
- Furthermore, I have video evidence from mid September 2017 of the child making declarations of being abused by her grandmother and mother without being prompted. Again, this video evidence is contained within the 32 minute video on the URL https://youtu.be/ Aq7MFAdB1A

- On June 26, 2018, over-holding the child prompted an emergency court session by the mother Sonia Gulian.
- On this date, we were before Judge Akbarali of the Toronto Superior Court.
- I was confident entering this court process simply because of all the evidence I have stated above, and believed that there was no way a Judge could ignore this evidence.
- I found out the morning of June 26, 2018 that while my attorney had the case file on his desk for 9 months, he had not reviewed it and was grossly unprepared.
- This attorney made me write an affidavit in the 45 minutes before the court hearing.
- I asked the Judge Madam Akbarali that since my attorney was unprepared, that I felt comfortable speaking in his place and presenting the multiple pieces of evidence that I have that clearly show my concerns to be valid.
- Madam Jasmine Akbarali began yelling at me, and not allowing me to speak.
- Without allowing me to speak, she began yelling out accusations against me.
- I was so distraught and overwhelmed by her behavior that my heart began pounding, and I began feeling like I was losing consciousness. I barely stumbled out of the court room and passed out right in front of the door of the courtroom.
- I became conscious hours later in a hospital room.
- Madam Jasmine Akbarali continued the court session on this day, despite the fact that there was nobody in the court that could adequately represent me, as my attorney had made it clear that he was completely unprepared.
- Judge Madam Jasmine Akbarali made the decision during this court session to limit contact with my children to only two weekends every month, and supervised contact only, which cost me $60 an hour at a time when I was nearly drained of all my finances during a 22 month Hague trial which UK Judge The Honorable Mark Rogers called "indicative of an ongoing war of attrition."

- In addition, while I had requested that a transcriptionist stay in the room so we could have court records, Madam Akbaraki dismissed the court transcriptionist, so we have no official records from this court date of June 26, 2018 that I have been able to attain despite trying on many occasions.

- Following this court session, Judge Madam Akabrali appeared on the next two sessions as the judge, and both times I asked her to recuse herself as she was clearly biased toward me, and both times, she refused to recuse herself.

- Also, both times she dismissed the transcriptionist despite my specific request that she do not do so, and again, I have been unable to get court recordings or court transcripts from these days.

- In June 2018, Sonia Gulian applied to the Toronto Superior court to hold the UK Judge's decision to return the children in contempt and 'reversed' by using the status quo that was attained through the "war of attrition" that she had waged in the UK.

- On September 4, 2018, we were before Judge Madam Jasmine Akbarali again.
  - I asked Judge Akbarali to recuse herself, as I did not understand how she could have appeared again after my hospitalization of June 26, 2018.
  - It is important to note that she appeared three times in a row for all material hearings, and did not allow any expert testimony or anybody to challenge her decision, which I contend was predetermined, and she and / or the opposing attorney had corrupted the scheduling to insure that no other judge would see this case in Canada before the children were returned to the UK.
  - On this date, September 4, 2018, I argued that the children should stay in Canada, and be treated for the trauma they had suffered due to their kidnapping and removal from their habitual residence.
  - Sonia Helen Gulian was arguing that the children should be returned to the UK, since they would miss school.
  - The treatment of my children was very important to me, as since when I was a child, I was separated from my father during a time when he was kidnapped by the terrorist group that would soon be called Hizbollah (in 1983) while he was a professor at a university and college in Beirut Lebanon.

- While I understood nothing about terrorism as a child, I deeply felt the terror and trauma a child feels when they are separated from their loving father.
- Judge Madam Jasmine Akbarali refused to have my children be seen by a therapist.
- Judge Madam Jasmine Akbarali forced me to order a Voice of the Children's report, which was in itself a corrupt choice because she made her decision before the Voice of the Children's report was even started.
- She made her decision on September 11, 2018, and the Voice of the Children's report was started on September 12, 2018, a day after Judge Akbarali gave her decision, and the VOC was completed on September 18, 2018.
- Furthermore, she gave me no choice of the voice of the children's reporter, and chose somebody who has a conflict of interest since she worked with the Children's Aid Society of Toronto, an organization that I had filed a complaint against because they had given me bad information about over-holding the child Child S on June 24, 2018, while also choosing not to study the children post kidnapping for trauma.
- This idea of not giving children therapy and treatment post kidnapping is absolutely reprehensible for anyone who has studied the effects of displacement and abduction. There is no medical nor scientific basis for playing Russian roulette with the mental health and welfare of children.

- **The Honorable Judge Mark Rogers vs: Judge Madam Jasmine Akbarali**
- The evidence shows that the court process for the children's return to Toronto, Canada, lasted 5 days, and every allegation of abuse was vetted heavily by the Honorable Judge Mark Rogers.
- After this decision, Three Lord Justices heard the appeals, and not only reaffirmed his decision, but were highly critical of the behavior of Sonia Helen Gulian.
- In comparison, I was before Judge Akbarali for 30 minutes on June 26, 2018, before I fainted and was hospitalized, leaving nobody of knowledge to report my evidence.
- Non the less, Judge Madam Jasmine Akbarali allowed this court session to continue without the presence of any valid party with the experience and knowledge to represent my side.
- Following this June 26, 2018 court session, we had another session with Judge Madam Akbarali on September 4, 2018.
- On September 4, 2018, a 1 day court hearing, Madam Jasmine Akbarali heard my testimony for a total of 1.5 hours.

1
2
- On this date, she spent 2 hours contemplating the request for recusal after returning to the court and refusing to do so.
3
- She listened to my wife's attorney for 4.5 hours.
- This left us with less than 1.5 hours to speak.
4
- We were rushed, and she demanded that we exclude closing statements and evidence, as she had a "hard out" at 5pm.
5
6
7
- Furthermore, her decision of September 11, 2018, clearly shows her stating that she did not have time to look my evidence, and that while she has decided to return the children, the proper viewing of evidence would have to be delayed to a future trial in Toronto.
8
9
10
- Meaning, she did not look at any of the evidence at hand before being in contempt of the U.K. court order for the children's return to Canada, and simply returning them back to the UK, as if the Hague Application never happened.
11
12
- She also made comments within the court that Sonia Gulian had not kidnapped the children, and that she had just taken them 'home'.
13
14
- Home was never England. The children were born and raised in Los Angeles, with a two year stay in Canada while I was under contract with a film and television company there.

15
**The reprehensible Bias of Madam Jasmine Akbarali, in her own words**
16
17
- Further reading of the decision of Judge Madam Akbarali of September 11, 2018 shows her to display an incredible bias.
18
19
- While not having seen any of the evidence I had to present, which she admits in her decision in multiple places, she has already decided that the children will finish high school, year 12, in the UK.
20
21
22
- She states that the mother winning custody is inevitable because she is the "primary caregiver", a statement that is simply untrue as I had left my work for nearly an entire year in 2013 to attend to the children's needs, and only chose work in 2014 to 2016 that allowed me to work from home.
23
- But she had not seen my evidence, so she would not know these facts.
24
25
26
- While I worked from home during the day when the children were in school, I was the primary care giver when they are at home from school, and the bundle that is attached herein attests to the level of my involvements.
27
28
- For example, Principle Graham of Toronto states that he had seen me often bringing and taking the kids from school, as well as being heavily involved in every school activity.

- In addition, I was the person guiding the children's schooling and educational development since 2013 until 2016, a period of time when both the children thrived.
- Madam Akabrali went on to state that I would leave the children for 3 months every year to go work in Los Angeles, which is again untrue.
- Had she looked at my evidence, she would see that the one time that I had to leave Toronto for 4 months in 2015, the children came with me and were housed with me in Los Angeles, where I worked exclusively from home and home schooled the children.

- There are many more contempts and other issues with how Madam Jasmine Akbarali conducted her court session in contempt of the Hague return order, including that she accepted false accusations that the Honorable Judge Mark Rogers (UK) had already found not credible within his court, and she did this only on the basis of Sonia Helen Gulian making such claims with no evidence to back up her assertions.

- **There is a lot more to this matter in terms of the awful corruption of the court process, but this document is already quite long and detailed, so I will try to be brief about some of the other points.**
  - Judge Freya Kristjanson fabricated court documents to make it seem like I was "self represented", when in fact I had no presence in the room.
  - In this deck you will find court documents from June 2019 that clearly state I had no representation, and no council in the courtroom of Judge Freya Kristjanson on these court dates.
  - Evidence from my credit cards, as well as my travel documents show that I was in California at the time, not Toronto, Ontario.
  - Yet in December 2019, when Judge Freya Kristjanson sent her detailed decision for these June 2019 court dates, she had changed "no representation no council" to "self represented."
  - Judge Freya Kristjanson went on to fine me $300,000 for cyberbullying in this court decision of June 2019 and created a new tort of significant punishment.
  - I believe she realized that when somebody has no representation in the room to fight back against allegations, the tort she has created loses its credibility and value, hence she had to falsify these court documents in the interest of self preservation.

- In addition, I have been running a private administrative process, and thus questioning those who made false statements on the behalf of the Gulian family, and assisted in their International conspiracy to kidnap these children and deprive the children and I of our Civil and Human Rights under the color of law.
- I am learning that there are other court documents that were forged, and submitted to the Canadian court as authentic.
- Nearly all of the people who submitted false reports to the court, or aided and abetted this willful obstruction of justice, have been running for the hills during this private administrative process.
- This includes:
  - Arthur Gajewski, the social worker who submitted a perjured affidavit to the court about the events of Nando's May 15, 2018. He has yet to respond to his private administrative questioning.
  - I found out that Antony and Zvart Gulian gave a bribe to the school St Robert Southwell (in the form of a "donation") so that the children could be admitted, even through there was a long waiting list, and they were the last in line.
  - This school ignored all protocol and made no attempt to contact me for information about the children.
  - I have submitted a private administrative process questionnaire to the Headmaster of the school, Mrs Beck, and she had refused to answer any questions and instead has gotten the lawyers for the school involved.
  - I submitted a private administrative process questionnaire to the first doctor in the UK that stated Sonia Gulian had PTSD upon her visit to him on November 23, 2016 (after the the children were enrolled in the school).
  - This Doctor, Doctor Parsonage, has gotten the Defendants Law Firm Dawson Cornwell involved, and refuses to answer questions.
  - It is important to note that Dawson Cornwell were the ones who referred this doctor to Sonia Helen Gulian.
  - I have submitted similar questionnaires to Sonia Gulian's immediate family, and with time lapsed for a response, I have heard nothing.
  - Dr Zapata, Sonia Gulian's expert witness who tried to argue that she has PTSD, and whom the court found not credible. I have sent him a private administrate process questionnaire, which he has thus far ignored

- Also, I have done research on Dr Zapata, and found out that he was disciplined in 2009 for being caught with an illegal drug substance.
- In addition, one of his patients set himself on fire and committed suicide after Dr Zapata changed his medication.
- There will be much more evidence that comes forth, as this is an ongoing process, but I can sum up what Ive learned thus far.
- I believe that Dawson Cornwell, recognized as one of the most powerful Family Law firm in the UK, has a stable of such bad actors at their disposal. Like Dr. Zapata, Arthur Gajewski, who can be bought at a price.
- I also have evidence in the form of a recording of Zvart Gulian from February 25, 2018, stating that she has spent "100s and 1000s of dollars" on this matter of the abduction of the children.
- The issue with this statement is that Sonia Gulian has had legal aid throughout the entire Hague Process, all the way until this case went back to Canada on June 18, 2018, 4 months after this recording.
- So what did Zvart Gulian spend "100s of 1000s of dollars" on?
- I would submit that it was to bribe St Robert Southwell, to bribe Arthur Gajewski, to bribe Dr. Zapata, and others, to create these piles of lies that have resulted in the this 4.5 year travesty of justice.
- As stated, this matter is ongoing through this private administrative process, so with time, more crimes and falsehoods will be revealed.

**The Real Reasons behind the "Cyberbullying" accusations**
- In their decisions, both Judge Freya Kristjanson, and Judge Madam Jasmine Akbarali, stated that I could not see the children or speak to the children, until I removed online videos.
- They stated that I was "cyberbullying" my ex wife.
- It is illegal to withhold contact with ones children in this manner.
- Non the less, this is what they did, and it was not because of "cyberbullying", but rather an attempt to cover up their own judicial contempt and corruption.
- The videos I have made have been for the sole purpose of attaining expert guidance and investigating the truth.
- The primacy accusations that these videos make are against these two corrupt judges, Judge Akbarali and Judge Kristjanson.

1
2
3

- All the videos I have sent are UNLISTED, meaning that if you don't know they exist, and you don't know either 1- the name of the video or 2- where the video is, then you can't view it. It is a secret video unless you have specific information that could guide you to a link of that video.

4
5
6

- Furthermore, the only people that see these video are experts sworn to confidentiality, like Child Welfare experts, PHD Doctors that specialize in the area of childhood trauma and kidnapping, US and UK Government officials, Legal experts and lawyers.

7
8
9
10

- Without these individuals, I would have no fair ground toward access of justice. I don't have the wealth to hire a firm like Dawson Cornwell to do my bidding. Nearly all the work I am doing now is self representation with the help of some very smart individuals in the background that are professionals in the capacities described in the paragraph above.

11

**The lawless precedent set forth by the two Canadian judges**

12

- Furthermore, the contempt of these Canadian judges has created a precedent that has been very difficult to overcome.

13
14

- While I was granted access to the children by UK Judge Philip Drury Moor, in January 2021, my ex wife continued to breach this order.

15
16

- She came up with a series of ridiculous demands, for example, supervision of the call is not enough, and that I had to agree to a whole different set of rules if she were to allow contact.

17
18
19

- Hiring a top 5 agency social worker was not enough, and she insisted on her own independent social worker, again suggested by Dawson Cornwell, like Arthur Gajewski, Dr. Zapata, and other "independent" types that have a history of doing exactly as they are told by the Gulian Family and Dawson Cornwell.

20
21
22
23

- In February 2021, after realizing that Sonia Helen Gulian had no intention of following any court orders, as her 4.5 years of bad behavior and had faith indicates, I published a private and unlisted video and website that breaks down the contempt and corruption that happened in Canada with the intent of collecting valuable legal and other expert knowledge for the battle ahead.

24
25
26

- This website and video was sent to only 23 individuals that are professionals working in confidentiality, precisely Constitutional Lawyers, retired judges, US Authorities, and UK Authorities, Children's expert doctors, experts with published works and PHDs.

27

- They have supplied expert letters about the children.

28

1  − They have also taught me key elements to conducting a private
   investigation to help with my simple case of being allowed to
2  be a father to my children.
   − After realizing that my ex wife would never obey court orders,
3  I flew to the UK on May 1, 2021 with the purpose of being be-
   fore a judge on May 4, 2021, so that the order of January 13,
4  2021 could be enforced.
5  − I informed Judge Moor that I was arriving to the UK with my
   mother, for the sole purpose of contact with the children, and
6  he invited me to contact his clerk when I arrived to the U.K.
7  − My mother, age 73, left her husband at home, age 77, during the
   difficult days of Covid 19, where we had to go through rigorous
8  testing and a difficult travel process, to simply come to the
   U.K.
9  − My ex wife brought up the false allegations of "cyberbullying"
10 and stated that I was publishing videos in breach of the Cana-
   dian court order, which unfortunately, the UK judge supported,
11 in this case Judge Philip Drury Moor, and cut off contact with
   my children.
12 − This is despite the fact that all the metrics of the website
13 and video in question show that this is an unlisted video, seen
   by only 23 professionals, with the goal of attaining legal ad-
14 vice and direction.
15 − I have been in the UK all of May 2021, and plan on being here
   in June, July and as long as it takes to correct this horrible
16 contempt of the Honorable Judge Mark Roger's court order by
   Canadian Judges Akbarali and Kristjanson, and to restore my
17 rights under the law, as the father of Child S and Child V.
18

19 **Judge Moor Follows the Corruption of Judge Akbarali and Judge**
20     **Kirstjanson**

21 − The sole reason that Judge Moor revoked my order for contact
       with the children was because of the corrupt orders set
22     forth by Judge Akbarali and Judge Kristjanson of Canada.
23 − I was prepared for Sonia Helen Gulian to use the false accusa-
       tions of "cyberbullying" against me for the May 4, 2021
24     hearing.
25 − For this reason, I submitted a considerable amount of evidence
       5 weeks in advance of the court date of May 4, 2021, to be
26     able to ward off such accusations.
   − Unfortunately, Judge Moor did not look at any of my evidence,
27     which was submitted way in advance, while taking the time
       to look at material by Sonia Helen Gulian, that was sub-
28     mitted 5 business hours in advance of the hearing.

1   - The Entire Canadian trial under Judge Akbarali and Freya Krist-
2       janson was based upon a violation of my rights with the
        key matter being that I published videos and made videos
3       of child abuse upon my children. As explained above, this
        is a gross violation of my rights.
4   - Judge Moor decided to keep this gross violation of my rights
        going within the UK Courts.
5   - In the deck that will be submitted with this case at a later
6       date (by July 1, 2021), I will include my entire case
        against Judge Jasmine Akbarali and Judge Freya Kristjanson
7       of Canada, in order to capture the full lineage of the
        corruption and conspiracy to internationally abduct these
8       children, that started upon the children's Hague applica-
        tion mandated return to Canada in June of 2018.
9

10
**Damages and Restitutions**
11

12  - The goal of this hearing, which I believe should be at least 3
        days in length, is to present all the evidence on hand,
13      and to ask an American Judge that they issue orders for
        the followowing:
14      - Id like the court to issue an order to restore all of my
15          rights as they were prior to the kidnapping and abduc-
            tion of my children on October 15, 2016
16      - Id like the court to issue an order to remove all the
            defamatory false information and false accusations
17          that have been placed online due to the judges in
18          Canada, and also all the Blogs that mimic and report
            on these false accusations, and most especially, any
19          material that falsely refers to child S as "disabled".
20          This is simply more child abuse upon a child whose
            life has already been significantly damaged due to the
21          abusive behavior of the maternal family, assaults upon
            child upon the maternal family, causing mental, physi-
22          cal, psychological and emotional damage of her mother
23          and grandmother.
        - Id like "Sir Judge Philip Drury Moor" to be brought down
24          from his position as judge, a position that he does
25          not deserve, a position whose code of ethics he has
            violated.
26      - Id like Mr Philip Drury Moor to pay for the expenses that
            my mother and I have incurred by committing to being
27          in London until this matter is resolved. In my estima-
28          tion, this amount is around $100,000 USD.

1  - Id like Mr Philip Drury Moor to pay for the damages to my
2      business. This summer 2021 was a big summer for us as
       a health and wellness company that thrives during the
3      summer. Unfortunately, this summer will cause me to go
       into debt, and while that number has not settled, I
4      estimate the costs of being away will be upward of
       $100,000 USD.
5  - Id like Mr. Philip Drury Moor to pay for emotional damages
6      toward my mother and myself, as he has continued this
       nightmare with unlawful behavior, and I believe that
7      number number is $1 million USD, but it has not set-
       tled as the damage is ongoing.
8  - Id like the Crown of England, who is unlawfully holding my
9      children, to return the children to me immediately,
       and to allow us to return home to the United States,
10     where the children were born, and where the children
       grew up.
11 - As I have explained, the Crown has acted completely ille-
12     gally in claiming jurisdiction over my children, and
       thereby my children must be returned immediately.
13 - Id like the Court to submit this case into the Hague In-
       ternational Criminal Courts.
14 - Id like the court to Invalidate the judgements from Canada,
15   which happened under corrupted circumstance, and occurred
     because the order of the Honorable Judge Mark Rogers of the
16   UK to return these children was held in contempt by Judge
     Akbarali.
17 - Id like the court to hold the Judge Madam Akbarali in Cana-
18   da in contempt of the Hague Application return order.
   - Id like the court to file a criminal conspiracy report on
19   these matters explained below and evidenced in the attached
20   bundles.
   - Id like the court to File an injunction.
21 - Id like the court to assign a prosecutor to file charges.
   - Id like the court to Issue warrants for arrests and summons
22   of the criminal parties, namely Sonia Helen Gulian, Zvart
23   Gulian, and Antony Gulian, Arthur Gajewski, Edyta Lek-
     sander.
24 - Id like the court to lay criminal charges against these two
25   corrupt and unscrupulous social workers, Arthur Gajewski,
     and Edyta Leksander.
26 - Id like the court to charge the 2 judges in Canada, Judge
27   Madam Jasmine Akbarali and Judge Freya Kristjanson, with
     conspiracy to commit international kidnapping under color
28   of law, willful blindness to justice, obstruction of jus-
     tice.

1
2
    — Id like the court to banish Judge Akabrali and Judge Krist-janson from ever holding public office again, and I would like this court to enforce such an order on these corrupted Canadian judges.

3
4
    — Id like the court to charge the 2 judges in Canada, Judge Madam Jasmine Akbarali and Judge Freya Kristjanson, with conspiracy to interfere in civil rights under color of law.

5
6
    - Id like the court to issue and order that social workers Arthur Gajewski and Edyta Leksander should never be allowed to practice in any fields involving children.

7
8
9
10
    - Id like the court to hold Arthur Gajewski responsible for knowingly committing aggravated perjury with an intent to cause harm, and committed criminal contempt, and for being part of a international criminal conspiracy to rob children and their father of their most essential Civil and Human rights, under color of law.

11
12
13
14
    - Id like the court to submit these criminal actions to a prosecutor of all the conspirator parties with the intent to lay criminal charges upon all those who conspired to commit international kidnap of two minor children, under color of law, and thus caused child abuse, child assault, and deprivation of rights of minor children and their father, under color of law.

15

16

17
18
19
                  Dated this 7th day of June, 2021

20
                       VEM MILLER YENOVKIAN
                       Self Represented

21

22

23

24

25

26

27

28